## Funk *versus* Haldeman *et al.*[1]

1. McElheny being the owner of a farm, composed of land in Cherry Tree and Cornplanter townships, in consideration of $200, granted to Funk, his heirs and assigns, the free and uninterrupted privilege to go upon a tract of McElheny's land in Cornplanter township, for prospecting, boring, &c., and erecting engines, &c., and taking any ore, oil, &c., out of the earth, Funk to have the exclusive use of one acre of land around each pit or well, with free ingress on said land in common with McElheny; Funk diligently to use all reasonable efforts to obtain oil, &c., and give McElheny one-third of all "that is taken out;" McElheny reserving the right of tillage. McElheny afterwards conveyed to Haldeman, all his farm subject to the agreement with Funk. Haldeman afterwards agreed with Funk, that his rights should include all the land in Cornplanter township, reserving a strip, &c., giving to Funk the right to transfer in whole or in part to others, and afterwards granted to Funk the same rights in the Cherry Tree tract as he had in the Cornplanter. *Held*, that McElheny's deed limited Funk's rights to Cornplanter township; that Haldeman's first deed extinguished Funk's rights in the strip, but confirmed them in the remainder, and that Haldeman's second deed gave Funk the same rights in Cherry Tree that he had in Cornplanter township.

2. The conveyances gave Funk an incorporeal hereditament in fee.

3. Funk's interest would have been indivisible at law, but was made divisible by the grants.

4. Funk's interest at law, which would have been in common with the grantors, was made exclusive within its lines by the parties.

5. The grantors have no mining privileges, and can have none until Funk shall have forfeited his rights by breach of covenants.

6. The incorporeal hereditament, always a creature of contract, is a collateral incident which may or may not belong to the thing corporeal without any visible alteration therein.

7. The grants to Funk did not amount to a lease, nor a sale of the land or the minerals; no estate in soil or minerals was granted.

8. Caldwell *v.* Fulton, 7 Casey 476, affirmed.

9. The right granted to Funk was to experiment for oil, sever it from the soil and take it on yielding one-third to the landlord.

10. The $200 paid was the consideration for the entry to experiment; the consideration for the right to the oil was to be measured by the oil taken.

11. Funk's right was a license to work the land for minerals; it was a license coupled with an interest not revocable at the pleasure of the licensor.

12. If Funk has violated his tenure or his covenants—if he has undertaken to divide into severalty, that which he could only hold as an entirety, he has lost all, but even then a chancellor would send the grantors to law to enforce the forfeiture. But no violation either of tenure or covenants having been shown, there is no forfeiture to enforce either at law or equity.

THIS was an appeal, by A. B. Funk, the complainant below— from the decree of the Court of Common Pleas of *Venango county*, in Equity.

In that court Funk filed his bill against Levi Haldeman *et al.*, praying for an injunction to restrain the defendants from interfering with complainant's working of certain valuable oil tracts leased, as complainant alleged, to him. The defendants alleged a forfeiture by sub-letting.

Hon. James Campbell, P. J., granted the special injunction.

[1] I am indebted for the report of this case to the Hon. F. CARROLL BREWSTER.—P. F. S.

[Funk *v.* Haldeman.]

The defendants filed a cross-bill, alleging that complainant had forfeited his right by sub-letting, and, after answers filed to the original bill and cross-bill, and testimony taken, the case was heard before Hon. Isaac G. Gordon, P. J., who delivered an opinion dismissing the original bill, and declaring a forfeiture as averred in the cross-bill.

From this decree Funk appealed. The question involved was the proper construction to be given to the papers, under which Funk claimed the right to dig for oil upon the lands. He contended that he was lessee with right to assign.

The landlords contended that Funk held under a mere license— that his letting other parties in was a surcharge, and worked a forfeiture.

It was stated that upwards of $9,000,000 depended upon the decision.

The title was thus described in the pleadings :—

The bill set forth that, October 8th 1859, David McElheny was the owner of a farm, originally consisting of two pieces ; one situated in Cornplanter township, the other in Cherry Tree township, Venango county—the said pieces together constituting the farm of said McElheny, on each side of Oil creek ; and on that day McElheny and wife made with Funk an agreement, bargaining and selling, in consideration " of $200, to Funk, his heirs and assigns, the free and uninterrupted use, privilege, &c., to go on any part of the 200 acres for the purpose of prospecting, digging, &c., to find any ore, oil, salt, coal or other minerals, and of taking the same out of the earth," and the exclusive use of one acre of land at each well, with free ingress, &c., over said land by Funk, his hands, teams, tenants and under-tenants, occupiers or possessors of said wells, &c.

Funk bound himself to commence operations the next spring— to put a steam-engine in operation—to use energetically all reasonable efforts to obtain the oils, &c.—to give one-third of all that should be taken out to McElheny—that if the experimenting failed the " premises should revert back" to McElheny, and McElheny to have the privilege of tilling the land, subject to the rights of Funk.

The bill further alleged the payment of the $200 by Funk, a conveyance of the land by McElheny to Hussey, McBride & Halderman in fee, subject to the above agreement, and an agreement between them and Funk, March 26th 1860, confirming the former agreement, with power to subdivide and sub-let the land in whole or in part.

The bill also averred that Hussey, McBride & Haldeman, March 29th 1860, granted to Funk the oil and mineral right to said land.

The bill averred a performance by Funk of all his covenants—

[Funk *v.* Haldeman.]

MAP OF THE McELHENY FARM.

Owned in fee by { JOSEPH D. HUSSEY,
WM. D. McBRIDE,
LEVI HALDEMAN,
JAMES FARMER.

Oil and
Mineral Interests
belong to { A. B. FUNK
and
others in fee.

[Funk v. Haldeman.]

that Hussey, McBride & Haldeman pretended to doubt his right to subdivide and sub-let the land, and that for the purpose of removing said pretended doubts Funk surrendered a strip of land to them, and they expressly gave him the right to assign and transfer the privileges granted to him, and to subdivide said lands, &c.

The complainant charged, therefore, that he had the *exclusive* right to dig for oil, &c., and the right to sub-let, but that the defendants pretended that they had the right in common with the plaintiff to work any portion of the land not actually operated upon by plaintiff, and that in pursuance of said pretended right the defendants had entered on the premises, and commenced digging for oil, building houses, &c.

The bill concluded with the usual prayer for an injunction to restrain defendants from operating for oil, and from using any portion of the premises except for agricultural purposes, &c. To this bill the defendants filed answers and a cross-bill, in which they alleged that the right to subdivide and underlet was given by them in the agreement of March 26th 1860, gratuitously and without advice from counsel, and they denied that large expenditures had been made by Funk before the conveyance to him. They admitted that they had entered on the land to search for oil, that they had laid out lots, and had given parol licenses to build, but they denied that plaintiff's agreements gave him the exclusive right to dig, mine, &c., and averred that said instruments were mere licenses to search in common with defendants. They further denied the plaintiff's right to subdivide or underlet, and insisted that he had surcharged the tenancy of certain lots, and forfeited all right to the same.

An answer was filed by Funk to the cross-bill, and a large amount of testimony was taken.

The various agreements are recited at length in the opinion of the court. After the preliminary injunction had been granted, Funk sold his interest in the lands to the McElheny Oil Company, who were substituted as plaintiffs.

Upon final hearing, as already stated, the court dismissed the original bill, decreed a forfeiture as to two lots, and the complainants appealed.

The complainants were represented by Messrs. *R. Biddle Roberts, Thomas M. Marshall, Eli K. Price* and Hon. *Walter H. Lowrie.*

*F. Carroll Brewster,* representing one of the sub-tenants, was allowed by the court to take part in the argument.

The appellees were represented by Messrs. *C. Heydrick, F. T. Backus* and *George R. Snowden.*

[Funk *v.* Haldeman.]

The case was argued at Pittsburgh, November 9th 1866.

*Thomas M. Marshall, F. Carroll Brewster* and Hon. *Walter H. Lowrie*, for appellants, argued that the cases relied upon by the court below did not justify the decree entered. They referred to those cases, viz.: Lord Mountjoy's Case, 4 Leon. 147; Moore 174; Godbolt 171; And. 307; Co. L. 164 b; Cheetham *v.* Williamson, 4 East 469; Doe *v.* Wood, 2 B. & Ald. 724; Grubb *v.* Bayard, 2 Wal. C. C. R. 81; Id. *v.* Guilford, 4 Watts 223; Johnstown Iron Co. *v.* Cambria Iron Co., 8 Casey 241: and showed that they differed from this, for in those cases,

1st. No present consideration had been paid.

2d. There was no word excluding the grantor.

3d. There was no covenant binding the grantees to take ore.

4th. There was no reservation of a right of tillage, as here. *Expressio unius exclusio alterius.*

5th. There was no clause in any one of those cases under which the lands, as here, were to " revert back."

They further argued that this case was not to be ruled by Clement *v.* Walter, 4 Wright 341, for there the grantee had only paid a nominal consideration of $1. He had never put up the works, and " what he was bound to take, and when, was uncertain." And that Huff *v.* McCauley, antè, p. 206, decided by this court since this appeal, did not rule this case, for in that case there was merely a verbal agreement by McCauley that Huff should take as much coal from McCauley's land as he wanted for his salt-works.

They relied upon the recital of Funk's lease in the deed under which appellees acquired their title. They argued that Funk's rights were not those of a mere licensee, for, 1st. In a license there is no exclusive holding; here there is exclusion. 2d. A licensee is not bound to proceed; here, Funk was bound to use diligence.

But even if the court should construe this as a license, it could not be forfeited for doing that which the appellees had expressly permitted. That Funk's interest was expressly made divisible and exclusive in him and his assigns. If exclusive, there could be no surcharge, and no forfeiture for subdivision.

There is nothing strange or unusual in such a claim. Claims perfectly analogous to it abound in life and in juridical administration. Such are rights of coal, stone, gravel, salt, water, ways, pasture, fore-crop or prima tonsurâ, after-crop, fishery, oystery, ferry, water-power, flowage by drains, growing timber, growing crops, warren, turbary;—many of them are very common in our state. The right to the land may be in one and these other rights in any number of others. No special forms are necessary in assuring such rights. In some cases they are real and in others

[Funk v. Haldeman.]

they are incorporeal. Trespass and ejectment will lie where the right is exclusive. Judicial sagacity never allows the rules of legal art to set aside the common sense of the people.

Here two-thirds of the oil belong to Funk, and one-third to the owners of the land. Oil, like water, is essentially indivisible, and taking it in one place draws it off from all others; and as the owner cannot take oil from our wells, he cannot steal the fluid rights by tapping at a distance.

They cited Wilson v. McKreth, 3 Burr. 1825; Caldwell v. Fulton, 7 Casey 476; Harlan v. The Lehigh Coal and Navigation Co., 11 Id. 287; 2 Washburn on Real Property 89; Woolrych 116, 117; 5 Burr. 2816; 2 W. Bl. 1151; 8 Q. B. 1000; Cro. Jac. 150; 7 East 200; 2 Wend. 524, 517; 17 Pick. 23; 9 Cow. 279; 17 Mass. 298; 8 Burr. 383; Angell 108; Butz v. Ihrie, 1 Rawle 218; 6 Cow. 677; 13 Pick. 323; 4 Id. 54; Tyler v. Williamson, 4 Mason 403; Bird v. Smith, 8 Watts 440; 14 S. & R. 267; 2 Story's Eq. § 927; Brightly's Eq. §§ 215, 296, 299, 300.

*F. T. Backus* and *C. Heydrick,* for appellees, argued that the admiration of the appellants' counsel for the opinion delivered by Judge Campbell, had led them into error. The indenture of March 29th 1860 had been confounded with the indenture of March 26th 1860. The indenture of March 26th 1860 related to a tract in Cornplanter township. The indenture of March 29th 1860 related to a tract in Cherry Tree township.

Two questions arise out of the several agreements:—

1. Were the privileges granted to Funk exclusive of his grantors, or to be enjoyed in common with them: and

2. If not exclusive, were they divisible as to the Cherry Tree township tract beyond the extent of the liberty expressly granted in the indenture of March 29th 1860.

The first question is common to all the agreements or deeds; the second arises only under the indenture of March 29th 1860.

1. As to the Cornplanter township tract. This was the only tract covered by the agreement of October 8th 1859 and the indenture of March 26th 1860. There was therein no grant of the oil or minerals and nothing to exclude the owner of the soil from searching and experimenting there also. The language does not even purport to grant the right to take any oil out of the earth. It is but a liberty to experiment and strictly an incorporeal hereditament: Johnstown Iron Co. v. Cambria Iron Co., 8 Casey 246.

The grant of the exclusive use of one acre of land, around each well, does not enlarge the privileges before granted. The previous grant would carry with it the right of ingress and egress and the exclusive use of a reasonable curtilage appurtenant to each well. The exclusive enjoyment was to be after appropriation, but before

that, the privileges were to be in common.  Looking at all the parts of the agreement, we have a grant of the privilege of making an experimental search for oil in consideration of $200, and constructively—not expressly—a grant of the privilege of taking any oil the grantee might find for another consideration, to wit, one-third part of all that he might under the liberty granted find and take out of the earth and no more.  The title to the oil did not pass in fee under this grant.  The $200 was no part of the consideration for the oil, it was intended as compensation for disturbance arising from the exercise of the license to search and dig.  In this the court below are sustained by Grubb *v.* Guilford, 4 Watts 423.  The agreement does not require Funk to take any oils out of the earth, and after boring one well he might have refused to proceed.  So, too, after having operated with one engine, he could not be required to multiply his operations.

He is the judge of the indications which are to justify him in operating and of the circumstances under which the enterprise might be abandoned as provided for in the agreement.

It is, therefore, manifest that Funk's covenant does not require him to take all the oil, and, therefore, he is not bound to pay for all.  If McElheny then sold all the oil it would be " a sale without consideration," and, as such, " is not to be held as intended by the parties, unless the language of the instrument shuts us up to such a conclusion :" Clement *v.* Youngman, 4 Wright 346.

Oil is not the subject of grant as a corporeal hereditament.  It is a movable, wandering, fugitive thing in the bowels of the earth, and must, of necessity, continue common like water, so that one can only have a usufructuary property therein : 2 Blackst. 18.  Lord Mountjoy's Case, 4 Leonard 147, is in close analogy to this case, but stronger in favor of an exclusive right.  In Cheetham *v.* Williamson, 4 East 469, the grant is quite as comprehensive as to the one under consideration and similar to it.  Doe *v.* Wood, 2 B. & Ald. 724, has been misunderstood by appellants' counsel.  See also, Grubb *v.* Bayard, 2 Wall. Jr., 96 ; Gillett *v.* Treganza, 6 Wisconsin 343.  Caldwell *v.* Fulton, 7 Casey 476, sustains the appellees.  The other cases cited are inapplicable,

1.  Because the deeds purport to demise the land.

2.  Because the landlord was necessarily excluded.

3.  Leases for tillage are favorably construed on grounds of public policy.

They further cited Bittinger *v.* Baker, 5 Casey 66.  Funk could not divide any lot and assign the smaller lot.  This is shown by the cases already cited and by Van Rensselaer *v.* Radcliff, 10 Wend. 639 ; Leyman *v.* Abeel, 16 Johns. 30.

It is no objection to the decree on the cross-bill that it enforces or declares a forfeiture : 1 Smith's Ch. Pr. 460 ; Story's Eq

[Funk v. Haldeman.]

389, 391; 3 Daniel's Ch. Pl. and Pr. 1744–45; Del. & Hud. Canal Co. v. Penna. Coal Co., 9 Harris 131–146.

The opinion of the court was delivered, January 7th 1867, by WOODWARD, C. J.—These cases are a bill in equity and a cross-bill, which are founded upon the respective titles of the parties to valuable oil lands on Oil creek, in Venango county.

The first remarkable feature of the case (for the two bills constitute, essentially, but one case) is the magnitude of the conveyancing that has taken place. Not less than twenty deeds and agreements are presented in our paper-books as bearing more or less directly upon the questions discussed, all of which have been made since 1859, when the right of the present parties first attached. It probably will not be necessary to notice particularly all of these conveyances, but several of them must be carefully analyzed and their legal effect fully stated, for in them the rights of the respective parties are rooted. And the principles of law appropriate to the case, and the mode of their application, are to be discovered only by a patient examination and comparison of the contents of several deeds.

On and before the 8th day of October 1859, David McElheny was the owner and occupier of two lots or tracts of land, one lying on both sides of Oil creek, in Cornplanter township, Venango county, containing 100 acres; the other lying on the north side of Oil creek in Cherry Tree township in said county, containing 85 acres, and the two together constituting his farm, though they touched each other only at one corner. To this latter lot in Cherry Tree, McElheny had then only an equitable title, but he obtained the legal title on the 27th of the succeeding February.

On the 8th day of October 1859, McElheny and wife entered into an instrument of writing with A. B. Funk, which is called an agreement, but is in form and substance a deed of conveyance, with mutual covenants. In consideration of $200, the receipt whereof from Funk is acknowledged, McElheny and wife grant, bargain and sell unto the said Funk, his heirs and assigns, " the free and uninterrupted use, privilege and liberty to go on to any part of the 200 acres now owned, occupied and in possession of the party of the first part, it being in the north part of Cornplanter township aforesaid, and lying each side of Oil creek, for the purpose of prospecting, digging, excavating and boring, and erecting thereon frames, vats, engines, or anything necessary for the prospecting, experimenting or searching to find any ore, oil, salt, coal or other mineral, and of taking the same out of the earth; also, we, the said party of the first part, do hereby grant unto the said party of the second part, the right, privilege and exclusive use of one acre of land at and around each well or pit, where

[Funk *v.* Haldeman.]

the indications are such as will justify in operating or experimenting ; and also, the said party of the second part, his heirs and assigns, are to have free ingress, egress and regress on and over said land by himself, hands and teams, tenants and undertenants, occupiers or possessors of the said springs, mines, ore or coal-beds, in common with the said party of the first part, their heirs and assigns.''

Then follow the covenants of Funk that he will use no more land for roads or ways than shall be absolutely necessary ; that he will commence operating the next spring, and will, during the spring and summer, put in operation a steam-engine on said land, and will energetically and diligently use all reasonable efforts to obtain the oils, ore or minerals sought for ; and if he succeed in finding or procuring any oil, ore, salt, coal or other minerals, then in addition to the $200 paid, he agrees to give the one-third part of all that is taken out of the earth on the premises, in barrels to be furnished by McElheny at the pit's mouth. Should the prospecting and experimenting prove a failure and the enterprise be abandoned, Funk was to have the privilege of removing all engines, vats and fixtures of every kind, and the premises to revert back to McElheny, whose right of tillage was in any event to be uninterrupted, except as to the one acre about each pit.

On the same day a supplemental covenant was made, that in case of a failure of the enterprise, Funk was to fill in all the wells or pits he may have opened, '' and in no case shall the said Funk be permitted to occupy any land within 100 yards of his (McElheny's) buildings.''

Some question was made in the argument as to the territorial extent of Funk's rights under this deed ;—whether they extended to that part of the farm that lay in Cherry Tree township, or were limited to the part in Cornplanter township. Whatever might be the construction of the deed, if taken by itself, and subject to the rule that deeds are to be construed most strongly against grantors, we entertain no doubt that the deed, when taken in connection with subsequent conveyances hereafter to be noticed, is to be limited in its operation to that part of the McElheny farm that lay in Cornplanter township, and can have no effect on the 85 acres in Cherry Tree.

Such was the original grant out of which this controversy sprang, but before pausing to notice its legal effect, it is necessary to bring several other conveyances into view.

On the 2d day of December 1859, McElheny and wife entered into another '' agreement'' with John H. Dalzell and Thomas Donnelly, which began by fully reciting the prior agreement of 8th October with Funk, and then went on in the form of an indenture to grant, bargain and sell to Dalzell and Donnelly '' the one-half of the oil, salt, coal or other minerals which may be

[Funk v. Haldeman.]

taken from the said lands in accordance with the agreement of McElheny and Funk aforesaid;" and in case Funk should abandon his rights, Dalzell and Donnelly were to succeed them, and for the rights hereby conveyed to them they were to pay McElheny $800. A subsequent clause defined that he was to convey only the one-half of the portion of the oil, salt or coal which he should receive from Funk. Such undoubtedly would have been the legal construction of the deed without the explanatory clause. It left in McElheny one-sixth of what is called the royalty that Funk was to pay, and transferred the other one-sixth to Dalzell and Donnelly, their heirs and assigns.

On the 28th of January 1860, McElheny sold and conveyed to William H. Ewing, in consideration of $595, one-twelfth of the royalty he was to receive from Funk, together with a right of succession to all Funk's rights in case he abandoned the enterprise, and Dalzell and Donnelly also elected not to take his place.

McElheny now retained to himself whatever interest in the freehold he had not conveyed to Funk, together with a right to one-twelfth of all the oil, salt or ore Funk should take out of the earth. Then, on the 22d March 1860, he and his wife in consideration of $20,000, conveyed by indenture to Joseph G. Hussey, William D. McBride and Levi Haldeman, all of the state of Ohio, both of the tracts of land before mentioned, particularly describing them by metes and bounds, the one in Cornplanter, the other in Cherry Tree township, and subject only to the three before-mentioned agreements, the first with Funk, the second with Dalzell and Donnelly, and the third with Ewing.

Four days after this deed had invested them with McElheny's proprietorship, to wit, on the 27th March 1860, Hussey, McBride and Haldeman, with their wives, entered into agreement with Funk, that requires particular attention. It recites the conveyances by McElheny to Funk and themselves, and then follows this recitation: "And whereas it is mutually desired by the parties hereto, that the boundaries of the land covered by the aforesaid grant to A. B. Funk, should be more definitely described, and that the part reserved and excepted from said grant should be more clearly ascertained and designated, than is done in said recited instrument of writing by reference to perishable buildings;" then, therefore, it is covenanted and agreed that the " grant of rights and privileges unto the said A. B. Funk shall be deemed, considered and construed to cover, extend over and include all that certain tract of land situate in Cornplanter township, bounded and described," &c., by courses and distances, " excepting and reserving from said grant all that part of said tract included in a strip 43 rods wide, and extending along the south side thereof from the east to the west line across the whole

breadth of said tract, said strip being of the length of 137 perches, and of the depth of 43 perches; and it is further agreed, that within the said limits and boundaries aforesaid, all and singular the grants, privileges, provisions and stipulations in said recited instrument of writing contained, are hereby ratified, confirmed and renewed; and that within the reserved strip aforesaid, said parties of the first part retain to themselves, their heirs and assigns, all the rights of ownership, as though none of the grants and agreements aforesaid had ever been made or entered into. It being understood also, and hereby expressly agreed, that the said A. B. Funk, his heirs and assigns, at his and their discretion, are to have the right of assigning and transferring the rights and privileges herein granted, in whole, to any one or more parties, or to subdivide said lands into suitable lots, and assign and transfer his rights and privileges aforesaid, to be exercised and enjoyed by his assignees or transferees severally within the limits of such lots or subdivisions."

The next paper, dated 29th March, said to have been executed and delivered 5th May 1860, was an indenture between Hussey, McBride and Haldeman and their wives of the first part, and A. B. Funk of the second part, wherein the parties of the first part in consideration of Funk's covenants, and of $1, granted to him the same rights on the tract in Cherry Tree township, which McElheny had granted to him in the tract in Cornplanter township, and in the same terms substantially, reserving however from this grant so much of said tract as is contained in lots marked and numbered 5 and 6 on a plot of a survey made by S. M. Irwin, dividing said tract into 10 parcels, said reserved lots 5 and 6, being about the centre of said tract, and running from the creek to the northern boundary line, being of the width of 36$\frac{6}{10}$ rods, and containing together 23 acres and 145 perches, within which said lots, 5 and 6, said parties of the first part retain to themselves, their heirs and assigns, all the rights of ownership, as though none of the grants and agreements herein contained had ever been made or entered into; but as to the other lots, marked Nos. 1, 2, 3, 4, 7, 8, 9 and 10, on the plot aforesaid, the said A. B. Funk, his heirs and assigns, are to have and enjoy all the rights and privileges herein granted, and the liberty of assigning and transferring said rights and privileges in whole, or as to any one or more of said lots, severally at his and their option and discretion."

Then follow Funk's covenants to commence operating that spring, to put up a steam-engine on the land, to use all reasonable efforts to obtain oil, and to deliver to the parties of the first part one equal third part of all that is taken out of the earth on the premises, and to use no more ground for roads and ways than shall be absolutely necessary.

[Funk *v.* Haldeman.]

The agreement concluded with a stipulation, that it shall not be construed as a conveyance of the "soil or land of the premises;" or to interfere with the right of the parties of the first part to occupy buildings, and to till the soil of any part not actually used and occupied by said Funk, and in case of the abandonment of the enterprise, Funk is to fill up excavations, remove engines and fixtures, and the "titles to said lands shall revert to said parties of the first part, their heirs and assigns, as fully and effectually to all intents and purposes as if this present indenture had never been made."

On these several deeds it is to be observed :—

1st. That they limit Funk's rights under the original deed of 8th October 1859, to the tract in Cornplanter township, and show that he acquired no right, by virtue of that deed, in the tract in Cherry Tree township.

2d. That as to the Cornplanter tract, his rights were extinguished in the part reserved, but as to all the rest of this tract, his rights were ratified, confirmed and renewed, with the very important additional right to subdivide said lands into suitable lots and to transfer them in severalty.

3d. That the same rights were conveyed to Funk by the deed of 29th March 1860, as to all of the tract in Cherry Tree, except 23 acres 145 perches reserved, being lots Nos. 5 and 6 on Irwin's plan, and that as to these lots he had no rights, but as to all the rest of the lots on Irwin's plan he had the same rights as had been granted and confirmed to him in the land in Cornplanter township, with the right of subdivision and alienation in severalty fully granted.

Hussey, McBride and Haldeman made leases to various parties of oil rights within their reservations, and Funk subdivided his territory (all the unreserved portions of both parts of the McElheny Farm) into suitable lots and let them to various parties, individuals and oil companies, for the purpose of raising oil, all his lessees being bound to yield the appointed royalty to the landlords, and to divide with him as agreed by them respectively. I do not know, that a more minute reference to these various leases, all bottomed on the conveyances we have gone over, would help us materially in defining the rights of the original parties.

But when Hussey, McBride and Haldeman, not content with mining for oil upon their *reserved portions*, claimed a right in common with Funk to mine *within his lines*, upon any land not actually occupied by him for mining purposes, and claimed, moreover, that Funk, by subdividing his rights, had forfeited them, so that neither he nor his lessees might lawfully take oil from *any part* of the premises, litigation became inevitable, and these bills were filed.

Two learned judges in the court below passed upon the ques-

3 P. F. Smith—16

tions arising out of this mass of conveyancing, and came to exactly opposite conclusions. For this reason, as well as on account of the intrinsic importance of the case, we have given more than usual attention to these questions, and I am now to state, first, the conclusions of the court, and then the grounds on which they rest. We are of opinion:—

1st. That the conveyances vested in Funk, in fee simple, within the lines designated in the deeds, an incorporeal hereditament.

2d. That this interest, which would have been entire and indivisible at law, was made divisible by the terms of the grants.

3d. That this interest, which at law would have been held in common with the grantors, was made by the parties exclusive in Funk, his heirs and assigns, within the designated lines.

4th. That whatever may be rights of way, of tillage and of building, reserved to the grantors within Funk's lines, they have no *mining* rights therein, and can have none until Funk, or those claiming under him, have forfeited their rights by breaches of their covenants.

Our reasons in support of each of these conclusions shall be stated as briefly as possible.

1st. The interest granted to Funk is an incorporeal hereditament. The first word that occurs in the definition of an incorporeal hereditament is "*right*." A *right* issuing out of a thing corporate, or concerning, or annexed to or exercisable within the same. It is no part of the corporate thing; that remains as perfect, after the right has issued or been exercised, as before. The incorporeal hereditament, always a creature of contract, is a collateral incident which may belong or not belong to the thing corporate, without any visible alteration therein.

When this right takes the form that is designated, in the classification of incorporeal hereditaments, a "common," it is called a *profit* which one man hath in the land of another. Not ordinarily an exclusive profit, for in the instance of common of pasture, though an owner of the soil grant another common of pasture, *sans nombre*, yet the grantee cannot use the common with so many cattle, that the grantor shall not have sufficient common for his own cattle: 1 Coke Litt. 122.

Recurring now to the very language of the several grants, which I have quoted from the deeds, it will be seen to amount neither to a lease, nor a sale of the land, nor of any of the minerals in the land. No estate or property, either in the soil or minerals, was granted. If the grantor's dominion over these was not as complete after the grants as before, it was because of the *covenants* which restrained it, and not because of any title to either soil or minerals that had vested in Funk.

This is a matter of construction. It was argued that upon the principles laid down in Caldwell *v.* Fulton, 7 Casey 476, we

[Funk v. Haldeman.]

ought to construe these grants as a conveyance of titles to the minerals, but the language will not bear it. There the grant was of all the coal in the land, for a sum *in solido*. We could make nothing more or less of it than a sale and conveyance, for a present consideration, of all that part of the land which the parties designated as "stone-coal," and though we have heard the ruling in that case repeatedly criticised, and have had occasion, very seriously, to reconsider it, we are to-day more firmly persuaded than ever before that the construction of the conveyance there was the sound and necessary construction. But here the right granted was to experiment for oil, if found, to sever it from the soil, and to take it, on yielding a third to the landlord, as a *chattel*, not as any part of the realty. And the only possession to which the grantee was admitted was such as was necessary to the exercise of this right. The exclusive possession even of the acre about the pit's mouth was to terminate with an abandonment of the experiment. And the consideration for this right was not in the $200 paid by Funk (that was only for the entry to experiment), but was to be measured by the oil taken from the ground. Herein it resembled the case of The Johnstown Iron Company v. The Cambria Iron Company, 8 Casey 241, much more closely than the case of Caldwell v. Fulton. As it was said in that case, that no more ore was sold than should be raised, so it may be said here, that no more oil was sold than should be raised. As to all not raised there was no change of property; as to all raised, one-third was retained and only two-thirds were sold. And that as a chattel.

If Funk acquired no estate in lands or minerals, what is his right to be denominated? I answer, a license to work the land for minerals. Bainbridge, in his work on the law of mines and minerals, p. 246, says, "there is a great distinction between a lease of mines and a license to work mines. The former is a distinct conveyance of an actual interest or estate in lands, while the latter is only a mere incorporeal right to be exercised in the lands of others. It is a profit *à prendre*, and may be held apart from the possession of land. In order to ascertain whether an instrument must be construed as a lease or a license, it is only necessary to determine whether the grantee has acquired by it any estate in the land, in respect of which he might bring ejectment. If the land is still to be considered in the possession of the grantor, the instrument will only amount to a license, and though the licensee will certainly be entitled to search and dig for mines according to the terms of the grant, and appropriate the produce to his own use, on payment of the stipulated rent or proportion, yet he will acquire no property in the minerals till they are severed from the land, and have thus become liable to be recovered in an action of trover."

[*Funk v.* Haldeman.]

In the coal-mining districts of Pennsylvania, leases for terms of years are very common. They·are estates in land. The rent is usually measured by the tons taken, but the tenant is bound to a minimum production annually, and the transaction amounts to a sale, at a price per ton, of the coal in the premises, and constitutes an interest in the lessee in the nature of a corporeal hereditament.

But though we hold the papers in this instance to constitute a license and not a lease, it is a license coupled with an interest; not a mere permission conferred, revocable at the pleasure of the licensor, but a grant of an incorporeal hereditament, which is an estate in the grantee, and may be assigned to a third party. Even a parol license, without consideration, on the faith of which the grantee expends money, cannot be revoked at the pleasure of the grantor, but will be enforced in equity: Le Fevre *v.* Le Fevre, 4 S. & R. 241; Rerick *v.* Keen, 14 Id. 271; and see Wood *v.* Ledbitter, 13 M. & W. 840, and cases in note.

Though this proposition is doubted, perhaps denied, in some of the states around us, it is not to be doubted that where large expenditures have been made under a *written license,* rights are acquired which will be upheld both at law and in equity.

2d. The second proposition is that the interest of Funk, which would have been entire and indivisible at law, was made divisible by the terms of the grants.

As to the first branch of this proposition, the indivisibility of such interests at law, Lord Mountjoy's Case is the leading case upon which all our subsequent law on this subject is built. What was that case? According to Anderson, who, as Chief Justice of the Common Pleas, took part in the decision and therefore ought to be the best reporter of it, there was nothing decided or said about the entirety and indivisibility of the mine-rights in question. Lord Mountjoy, seised of two parts of the manor of Sanford, sold and conveyed them by deed to J. Brown and Charles Brown, with a proviso that it should be lawful for Mountjoy, his heirs and assigns, at all times, to have, take and dig, in and upon the heath ground of the premises, sufficient ores, heath, turves, and other necessaries for the making of alum or copperas, and to build necessary houses, &c. Mountjoy then by deed granted full mine-rights in said manor to one Richard Leycolt, for the term of thirty-one years, the said Leycolt yielding therefor yearly to Mountjoy one-half of the clear profits of his mining operations. The case being before the Lords of the Privy Council, was by the royal command referred to Anderson, Chief Justice of the Common Pleas, and to Peryam, Chief Baron, to certify their opinions on the disputed points. These justices reported that we " have divers times conferred thereon, not only between ourselves, but with some other justices," and are of opinion, " 1st. That

[Funk v. Haldeman.]

said two parts were well conveyed to the Browns, absolutely, without conditions.

"2d. That Lord Mountjoy, by the assurance passed between him and the Browns, had a right in fee, to dig turves, ores, &c., as mentioned in the proviso.

"3d. That Mountjoy might dig ore and other things for making alum and copperas as he should think fit.

"4th. That we and others that conferred are very doubtful and cannot agree, whether any remedy by law is given for the things reserved by the indenture or no."

According to Anderson, these were the *only* points ruled in this famous case, and as he had studied the case with the aid of Ch. J. Wray of the K. B., Chief Baron Manwood of the Exchequer, "*et autres*," and decided it for the Privy Council, he surely ought to know, better than any other, what the points in judgment were. Yet Lord Coke, who was of counsel for Mountjoy, reports the points ruled, not in his reports, but several years afterwards, in his comments upon Littleton, and among them he states the following:—"That Mountjoy might assign his whole interest to one, two or more, but then, if there be two or more, they could make no division of it, but work together with one stock; neither could Mountjoy assign his interests in any part of the waste to one or more, for that might work a prejudice and surcharge to the tenant of the land, and therefore if such an uncertain inheritance descendeth to two coparceners, it cannot be divided between them: 1 Coke, Litt. (Thomas's Ed.) p. 536."

This point has been stated by subsequent reporters, Godbolt, Leonard, Moor, and perhaps others, and has been taken for law by the courts, both English and American: Chetham v. Williamson, 4 East 469; Doe v. Wood, 2 B. & A. 789; Grubb v. Bayard, 2 Wallace C. C. R. 97; Lyman v. Abeel, 10 Johns. R. 31; Caldwell v. Fulton, 7 Casey 475.

How are these discrepant reports to be accounted for? That Lord Coke was not superior to the professional infirmity which sometimes makes the "wish father to the thought," is shown by his frequent substitution of his own arguments for the resolutions of the judges. In his reports it is often very difficult to distinguish the points ruled by the judges from *his* inferences and observations. Southcote's Case, 4 Coke 83, is an instance in point, for which Lord Holt in the great case of Coggs v. Bernard, 2 Lord Raymond 915, rebuked his habit of "*improving*" upon cases and drawing unwarranted conclusions. It was probably a similar liberty he took with Mountjoy's Case.

But however this may be, it is certain that the courts in modern times have taken the law of that case from Coke rather than from Anderson, and it is now too late to correct the common error. We take it as it is ordinarily received, and we say

that the grants to Funk, judged merely by the granting parts of the instruments, constituted an entire and inseparable interest. He might assign it to one or more, but if to more than one they must hold together as tenants in common of an impartible estate, like that in Coleman *v.* Coleman, 7 Harris 100. To sever it was to destroy it.

But the legal effect of the grant could be controlled by the agreement of the parties, and we think it was very essentially modified by what we find in some of the deeds. In the original agreement between McElheny and Funk, we find no stipulation for the divisibility of the interest granted, but in the confirmatory deed of 26th March 1860, which was limited to the Cornplanter tract, it was expressly stipulated that Funk, his heirs and assigns, at his and their discretion, have the right of assigning and transferring the rights and privileges herein granted, in whole to any one or more parties (which was declaratory only of the legal effect of the instrument), " *or to subdivide said lands into suitable lots, and assign and transfer his rights and privileges aforesaid, to be exercised and enjoyed by his assignees or transferees severally, within the limits of such lots or subdivisions.*"

Now, it will be remembered that this deed withdrew altogether from Funk so much of what McElheny had conveyed as was contained in the " reservation," but as to the residue of the Cornplanter lot, if he was not to have the right to subdivide it into lots, and grant them in severalty, the above words are unmeaning. His rights are called " lands," by which we are not to understand the title to soil or minerals, but the rights were to be subdivided by subdividing the lands in which they existed and were to be exercised. And such a subdivision might be made as would constitute his grantees tenants in *severalty*—the technical word for a sole, separate and exclusive dominion. " Suitable lots," mean lots fitted for mining purposes, and there is no allegation that the divisions made were unsuitable in this sense. Upon such a subdivision the power of partition, not inherent in the title originally, attached, and the exercise of so plainly granted a power cannot work a forfeiture of estate. In Lord Mountjoy's Case there was no similar provision, but only a grant and a proviso in the ordinary technology of conveyancing. Without impairing the effect of that case a jot, we are bound to give effect to *all* the terms in which these parties have expressed their intentions. It would be a superstitious reverence for the name of Coke to allow his report of Mountjoy's Case to overrule the clearly expressed intentions of the parties now before us. He himself, if here, would " *note the diversity,*" and we must not overlook it, nor fail to give it effect. The same observations are applicable to the deed of 29th March 1860, relative to the tract in Cherry Tree, for there the division agreed on with Funk, and the power conferred on him to

subdivide and to grant in severalty, are equally express and plain. And, as in Mountjoy's Case, so in none that have followed it was there a similar condition of tenure.

3d. My third proposition has been somewhat anticipated already in what has been said. That Funk's interest would have been, by force of the mere terms of conveyancing, held in common with the grantors, is one of the deductions from Mountjoy's Case which is not to be questioned, but that, by supplemental terms, the parties meant to make it *exclusive* in Funk, his heirs and assigns, is, we think, equally unquestionable. Nobody will doubt that this effect may be imparted to a conveyance of such an interest. Says Bainbridge, p. 274, after reviewing the case of Lord Mountjoy and its English sequents, " it appears therefore that an exclusive right to minerals will not necessarily be conferred by the grant of a license to work them. But it must not be concluded, from these decisions, that the license to work may not be in such a form as effectually to vest in the grantee a sole and undisturbable right to the minerals. It may be generally laid down, that if it appear to be the intention of a deed of grant or license, that the grantee should be solely and exclusively entitled to work for minerals, the grantor will be afterward precluded from abridging or derogating from his grant by any attempt to exercise a right, similar only indeed, but incompatible with its former disposition." And even at common law a man may prescribe or allege a custom to have and enjoy *solam vesturam terræ*, from such a day to such a day, and hereby the owner of the soil shall be excluded to pasture or feed there; and so he may prescribe to have *separalem pasturam*, and exclude the owner of the soil, or *separalem piscarium* in such a water, and the owner of the soil is not to fish there : Thomas's Coke Litt. p. 185. All incorporeal interests lie in grant, and if custom may impose the quality of exclusiveness, much more the terms of the grant may.

We take up these multitudinous conveyances, then, to discover what relations the parties intended to establish between themselves; and what do we find? We find the parties arranging for a full development of the oil in these lands. The owners cut off and reserve to themselves a part of each tract, in which they might mine for oil in their own time and way. They license Funk to enter upon the unreserved portions of each tract to experiment for oil, to subdivide his premises into suitable lots for this purpose, and to assign and transfer said lots, in whole or severalty, according to his option and discretion, and then place him under covenants to erect machinery and fixtures, and "energetically and diligently" to use all reasonable efforts to obtain oil, and to give them one-third of all that he raises. Exclusive

[Funk *v.* Haldeman.]

possession of an acre around each well is expressly given to him. And the only rights of possession reserved to the grantors, have reference to roads, buildings and tillage, nothing, within Funk's lines, being reserved for the purpose of mining for oil. On the faith of this license, Funk, and others under him, incurred large expenditures, sworn in the proofs to have been between $75,000 and $100,000 in 1860 and 1861, and about $700,000 since that time, and they have kept and performed all his covenants.

Now, although there is no *express* stipulation that his mining rights shall be exclusive of the grantors, is it not a fair and necessary inference from the premises? Is it conceivable that the parties meant that when, after much labor and large expenditures, Funk should strike oil, the grantors might sink wells on the adjoining acre, and take not only a third of Funk's product, but all they could pump from their own wells, though they should dry up and ruin his wells altogether? If so, to what end were the premises so carefully marked out and divided between the parties? If so, what significance or value was there in the clearly expressed right to subdivide and assign to third parties?

Assuredly Funk's lessees would not have gone on to operate upon the subdivisions, if they had not thought they were getting exclusive rights therein. And the grantors would not have stood by in silence and seen their lessee and his sub-lessees expending time, and labor, and money, upon the faith of an exclusive right, if they had not also understood the papers to vest such a right. Their conduct in this regard might, with considerable reason, be treated as an equitable estoppel; but, as bearing upon the construction of the papers, it is exceedingly significant; and this is the light in which we are now contemplating it. Surveying the case all over as presented in the bills, answers and proofs, it is impossible to account for the conduct of the parties, except upon the presumption that, up to a comparatively recent period, they construed the papers as conferring *an exclusive right to mine for oil within the lines marked out for Funk.* When we construe them in the same manner, we are justified, therefore, by that best of all rules of interpretation—contemporaneous construction.

4th. The fourth proposition results as a corollary out of the former ones. If Funk's mining rights were exclusive within the lines assigned to him, it follows that the grantors can exercise no rights within those lines until a breach of the covenants has been established. Whatever rights they possess relate to the surface; and as to subterranean treasures, they have excluded themselves, as an owner of the soil may be excluded from a *separalem pasturam,* or a *separalem piscarium.*

Throughout this opinion I have treated oil as a mineral. Until our scientific knowledge on the subject is increased, this is the

[Funk *v.* Haldeman.]

light in which the courts will be likely to regard this valuable production of the earth. But out of this, results the difficulty of a strict classification of a right to take it, as an incorporeal hereditament. If a mineral, it is part of the land; and a right to take land, or any part of land, is not, strictly speaking, an incorporeal hereditament. Nor is the right to fire bote, or plow bote or turves; and yet, for the want of a better classification, this is treated in law as an incorporeal interest. To the same head is to be referred these oil rights.

One other observation shall conclude this too long opinion.

The parties stand in a court of equity; and it is impossible to shut our eyes to the fact, that what is asked for on behalf of Hussey, McBride and Haldeman, is that we should declare a forfeiture of the rights granted to Funk; not, perhaps, a forfeiture in form, but, in substance and legal effect, a forfeiture.

If Funk has violated his tenure or his covenants,—if he has undertaken to subdivide into severalty that which he could only hold as an entirety, he has lost all; for unless he remained clothed with the *whole*, he had *nothing*. Even then, however, a chancellor would be likely to send the grantors into a court of law, to enforce the forfeiture by ejectment; for equity does not, ordinarily, enforce forfeitures.

But upon full consideration of the papers, we are of the opinion that there has been no violation either of tenure or covenants, and therefore there is no forfeiture to enforce, either at law or equity.

And now, to wit, January 7th 1867, these cases having been argued and fully considered, it is ordered, adjudged and decreed, that the decree of the Court of Common Pleas of Venango county, of the 19th of July 1866, be reversed, set aside and taken for nought, and that the decree of the said court of 28th April 1864, be restored and confirmed as the decree of this court in the appellants' bill, and that the cross-bill filed in behalf of the appellant, be dismissed, and that the appellees pay the costs.