# NEPHI PLASTER & MFG. CO. v. JUAB COUNTY.

No. 1868.   Decided December 4, 1907 (93 Pac. 53).

1. WORDS AND PHRASES—"GYPSUM." Gypsum is a mineral, and constitutes a mineral deposit under the mineral laws.

2. STATUTES — CONSTRUCTION — MEANING OF WORDS. In determining the meaning of words used in a statute or Constitution, the construction placed upon them by the courts must prevail over the popular conception of the terms.

3. WORDS AND PHRASES — "MINES" — "MINERALS." The term "mines" is not limited to mere subterranean excavations or workings, nor is "minerals" limited to the metals or metalliferous deposits, whether contained in veins that have well-defined walls, or in beds or deposits that are irregular and are found at or near the surface, or otherwise.

4. CONSTITUTIONAL LAW — CONSTRUCTION OF PROVISIONS — EJUSDEM GENERIS — TAXATION. While, under the doctrine of *ejusdem generis,* when general words in a Constitution or statute follow particular words, the things contained within the general words must be of the same class or kind as those particularly mentioned, and general words will not be held to include anything which is of a class superior to the class mentioned in the particular words, the doctrine is only a rule of construction to aid in arriving at the intent of the lawmaker, and cannot be applied to override the fundamental principles that all words in a law must, if possible, be given their ordinary meaning, and that the intention of the lawmaker must be gathered from the language employed in the light of the context and of the subject-matter to which it is applied, and that when the intention is clear it must prevail, except that courts cannot assume that the lawmaker really intended to enact either absurd or unjust laws.

5. TAXATION — PROPERTY SUBJECT TO TAX — CONSTITUTIONAL PROVISIONS — CONSTRUCTION — MINES AND PROCEEDS THEREOF. Constitution, article 13, section 4, provides that all mines and mining claims, etc., containing or bearing gold, silver, copper, lead, coal, or other valuable mineral deposits, shall be taxed, etc., and the net annual proceeds of all mines and mining claims shall be taxed, etc. At the time the Constitution was framed the specified metals were the only ones mined in large quantities in the territory, and coal, with the exception of lime and common rock, was the only

nonmetallic product mined in quantity sufficient to justify the method of taxation proposed. *Held*, that the classification was not intended as a limitation, but an enumeration of substances then produced in quantity sufficient to warrant the method of taxation imposed, and, under the exception to the rule of *ejusdem generis* that where the particular things enumerated are complete so that there remain no others of like kind, then the things that fall within the general words must be assumed to be of a different kind and not *ejusdem generis* with those enumerated, the phrase "other valuable mineral deposits" embraces all mineral deposits, including a deposit of gypsum, and the net annual profits from the sale of products manufactured therefrom are taxable under the section.

APPEAL from District Court, Juab County, Joshua Greenwood, Judge.

Action by the Nephi Plaster & Manufacturing Company against Juab county. Judgment for plaintiff, and defendant appeals.

REVERSED AND REMANDED WITH DIRECTIONS.

*M. A. Breeden, W. A. C. Bryan, T. L. Foote,* and *Henry Adams* for appellant

*Van Cott, Allison & Riter* for respondent.

FRICK, J.

This action is based on sections 2684, 2685, Revised Statutes 1898, which provide for the recovery of taxes paid by a taxpayer under protest in case such taxes are unlawfully imposed. The action was commenced by the respondent to recover back the sum of $205 paid as taxes to the appellant, Juab county, under protest for the year 1904, and which, the respondent contends, were unlawfully imposed. It appears from the record that the respondent was then the owner of a placer mining claim patented, on and in which are contained large and valuable deposits of gypsum, which deposits are, and for a number of years, by means of the necessary

buildings, machinery, and appliances erected on said mining claim, have been, manufactured or converted into hard wall plaster, dental plaster, finishing plaster, fertilizers, and other manufactured products, all of which were sold on the market. The tax involved represents the ordinary rate of taxes imposed on the net proceeds or profits derived by the respondent from the sale of the products aforesaid, and were imposed by virtue of section 4 of article 13 of the Constitution of this state, which reads as follows:

"Sec. 4.    (Taxation of Mines.)    All mines and mining claims, both placer and rock in place, containing or bearing gold, silver, copper, lead, coal or other valuable mineral deposits, after purchase thereof from the United States, shall be taxed at the price paid the United States therefor, unless the surface ground, or some part thereof, of such mine or claim, is used for other than mining purposes, and has a separate and independent value for such other purposes; in which case said surface ground, or any part thereof, so used for other than mining purposes, shall be taxed at its value for such other purposes, as provided by law; and all the machinery used in mining, and all property and surface improvements upon or appurtenant to mines and mining claims, which have a value separate and independent of such mines or mining claims, and the net annual proceeds of all mines and mining claims, shall be taxed as provided by law."

The Constitution became effective January 4, 1896, and in April following the first Legislature enacted a verbatim copy of the section above quoted as section 3 of what was termed the "Revenue Act" (Laws 1896, p. 424, c. 129), except that instead of ending the section with the words, "shall be taxed as provided by law," the section ended with the words, "shall be taxed as other personal property." The act also provided the manner in which the net proceeds of mines and mining claims should be ascertained for assessment and taxation. Section 3 of the act of 1896 was carried forward into the Revised Statutes of 1908 and re-enacted as section 2504, with the exception of the four words, "as provided by law," which were omitted from the body of the section. In 1903 (Laws 1903, p. 76, c. 91) the section was

amended by adding thereto, after the words "mining claims," the following italicised words: *"And also the net annual proceeds of coke made from coal or bullion or matte made from ore not taxed, which is deemed a product of the mines, shall be taxed as other personal property."* Why this last amendment was added is not material now. From the foregoing it is manifest that the law in effect has undergone no material change since its first enactment, and is, in its scope and effect, as it was when first adopted. At all events the scope of the section must be limited in its effect to the terms used in the Constitution. With the intention of so limiting it, the district court entered its conclusion of law to the effect that the profits derived from the product manufactured from the gypsum taken from respondent's mining claim was not the subject of taxation as the net proceeds of mines and mining claims, and entered a judgment in favor of the respondent for the sum of $205, the amount of taxes paid by it as net proceeds, from which judgment Juab county appeals.

While there are numerous errors assigned, the whole case may be determined upon the one assignment, namely, that the court erred in its conclusion of law and in rendering a judgment for the respondent.

The appellant contends that gypsum is a mineral and falls within the term, "other valuable mineral deposits," referred to in the Constitution, and that it, or the product thereof, also falls within the clause, "and the net annual proceeds of all mines and mining claims," contained in the section quoted. The respondent concedes that the mining claim on and in which the deposit of gypsum is found and from which it is taken was located and patented under the mineral laws of the United States and of this state; that the net proceeds or profits amounted to a sum which would produce the sum of $205 under the legal rate of taxation, if such proceeds constitute the net proceeds of mines within the purview of the constitutional provision; and that gypsum is a mineral and constitutes a valuable mineral deposit. That gypsum is a

mineral, and constitutes a mineral deposit under the mineral laws, cannot well be disputed. Lexicographers, geologists, and laymen all agree that it is a mineral, and such is also the holding of the officials of the Interior Department of the government of the United States, as will be seen from the *Pacific Coast Mining Co. v. N. Pac. Ry. Co.,* 25 Land Dec. following decisions: *Phifer v. Heaton,* 27 Land Dec. Dep. Int. 57; *McQuiddy v. State,* 29 Land Dec. Dep. Int. 181; Dep. Int. 233; 1 Lindley on Mines, sec. 97. The only question for solution, therefore, is, does the profit realized from the product manufactured from the gypsum taken from respondent's mining claim constitute "net proceeds" under the clause in the Constitution that all net proceeds of "all mines and mining claims" shall be taxed, as the term is used in the Constitution? If it does, the court erred; if it does not fall within that clause, then gypsum, or the manufactured product therefrom, must be taxed generally as other manufactured products, and not under this section.

Respondent's counsel contend that the gypsum deposit, although a mineral deposit, does not come within the mineral deposits mentioned in the Constitution, and that it does not come within the term "mine" or "mines" as the term is there used. We might dispose of this contention by simply saying that it does clearly come within the term "mining claims," and is a mineral deposit, and therefore falls within the terms in that regard. In view of the contention, however, that the products of respondent's mining claim should not be taxed in this form, because they are not the net proceeds of a mine, as that term is popularly understood, we have examined the authorities, and we think that the workings on respondent's mining claim, under the decisions, also fall within the term "mine," and that minerals, *prima facie* at least, are not confined to the metals.

The question, however, is, what is to be deemed as being within the popular conception of a mine? Is it to be confined to the understanding that a farmer, stock raiser, or ordinary

merchant has of the term.   Or to what those who work in or come in contact with mines and mining rights generally and popularly understand it to be?   Or is it to be understood, when found in a statute or Constitution, what the courts generally have held it to mean?   In view that the decisions of courts are but the reflection of the common understanding with respect to particular things and the terms used in any industry, business, or calling, and are thus simply reduced to legal terms, we think that if the courts have construed and applied what is meant by the terms "mine" and "mines," then this meaning must control, and especially so when the term is used in some statute or constitution.   This must be so for the simple reason that the term will then have acquired a legal meaning, which, unless the contrary clearly appears from the context, must be deemed to be the meaning intended to be applied to it in the law in which it is found.

In 1 Lindley on Mines, secs. 87 to 97, the author reviews the authorities and discusses the meaning of mines and minerals, and there points out that anciently the term "mine" or "mining" meant subterranean excavation.   But in section 89 the author points out that the term "mine" has received an enlarged meaning in later times.   He says:

"These primary significations were soon enlarged, so that in time the word 'mine' was construed to mean, also, the place where minerals were found, and soon came to be used as an equivalent of 'vein,' 'seam,' 'lode,' or to denote an aggregation of veins, and, under certain circumstances, to *include quarries and minerals obtained by open workings.*" (*Italics ours.*)

In section 91, in his work on Mines, Mr. Lindley states some general rules of interpretation as applied in England and Scotland, the fourth of which reads as follows:

"Where the term 'mines' and 'minerals' are both used in the same deed or statute, the word 'minerals' is not, on that account, to suffer limitation of its meaning."

In referring to the authorities upon this subject, we cannot, for lack of space, give a statement of the cases, but must confine ourselves strictly to the point decided in them.

Turning now to the decisions of this country, we find that
the term "mines" is not confined to subterranean excavations
or workings, nor is the term "minerals" confined to metallif-
erous ores. In *Hartwell v. Camman*, 10 N. J. Eq. 128, 64
Am. Dec. 448, 3 Morr. Min. Rep. 229, the chancellor of the
New Jersey court of Chancery, in construing a deed in which
the granting clause read "all mines, minerals, opened, or to be
opened," after some discussion, at page 136 of 10 N. J. Eq.
(64 Am. Dec. 448), said:

"Nor can I see any more propriety in confining the meaning of
the terms used to any one of the subordinate divisions into which the
mineral kingdom has been subdivided by chemists either earthy or me-
tallic, saline, or bituminous. . . . I do not think the term should be
confined to the metals or metallic ores. I cannot doubt if a stratum
of salt, or even a bed of coal, had been found, they would have passed
under the grant."

In *Griffin* v. *Fellows*, *81 Pa. St. 114, 8 Morr. Min. Rep.
657, it was held that the term "minerals" is not to be limited
to metalliferous ores. *Gill* v. *Weston*, 110 Pa. St. 312, 1
Atl. 921, is a case where the question arose under an act refer-
ring to mining lands passed before petroleum was discovered.
The court held that petroleum was a mineral and was gov-
erned by the mining laws as such, although unknown when
the laws were passed. The case of *Murray* v. *Allred,* 100
Tenn. 100, 43 S. W. 355, 39 L. R. A. 249, 66 Am. St. Rep.
740, is a well-considered case in which a great number of au-
thorities upon that subject are cited and reviewed, and the
court concludes that under the term "minerals" all the known
minerals are included and not only such as contain metals.
It is accordingly held that petroleum passed under the grant
of "minerals." In *Detlor* v. *Holland,* 57 Ohio St. 502, 49
N. E. 690, 40 L. R. A. 266, the Supreme Court of Ohio con-
cedes and so holds that, as a general rule, under a grant of
"all the coal of every variety and all the iron ore or fire clay
and other valuable mineral," all minerals are included. In
that case, however, in view of special circumstances, the court

held that the petroleum did not pass under the grant. In *Armstrong* v. *Granite Co.*, 147 N. Y., at page 505, 42 N. E., at page 189 (49 Am. St. Rep. 683), the Court of Appeals, in construing the meaning of "all the minerals and ores," after a discussion of the subject, and conceding that under the term "minerals," metals are generally intended, the court uses the following language:

"But it would be an unwarranted limitation of such a grant or reservation to exclude from its operation beds of coal or other nonmetallic mineral deposits of commercial value, or to confine it to such minerals as were known or supposed to be on the premises at the time."

In *Brady* v. *Brady*, 31 Misc. Rep. 411, 65 N. Y. Supp. 621, it was held that a reservation in a deed of "all mines and minerals" included lime rock. To the same effect is *Phelps* v. *Church, etc.*, 115 *Fed.* 882, 53 C. C. A. 407. In *Northern Pac. Ry.* v. *Soderberg* (C. C.) , 99 Fed. 506, it is held that the term "mineral," in referring to mineral lands under the mining laws of this country, is not synonymous with "metals." This holding was affirmed on appeal in 104 Fed. 425, 43 C. C. A. 620. In a note to the case of *Armstrong* v. *Granite Co.*, reported in 49 Am. St. Rep., at page 691, the reporter, in giving his deductions from the decided cases, says:

"The term 'minerals' in a grant includes *prima facie* every substance that can be got underneath the surface of the earth for profit. If the terms 'mines and minerals' are used in a grant or exception, the word 'mines' will not, *prima facie*, be held to be the governing word, so as to restrict the meaning which would otherwise be attached to the word 'minerals.' "

From an examination of a large number of cases we are convinced that the foregoing is a fair deduction of the law upon the subject as declared by the modern decisions both of England and this country. From the foregoing, it thus seems clear to us that where we find the terms "mines and minerals" used in grants or in reservations, in instruments of conveyance, in statutes or Constitutions, under the modern

construction, the former is not limited to mere subterranean excavations or workings, nor is the latter limited to the metals or metalliferous deposits, whether contained in veins that have well-defined walls or in beds or deposits that are irregular and are found at or near the surface or otherwise. If, therefore, there are no other legal obstacles in the way, we would be forced to the conclusion that respondent's gypsum deposits are included within the term "other valuable mineral deposits," and would thus fall within the requirement of the Constitution that respondent be taxed on the net proceeds derived therefrom. It is, however, strongly urged by counsel for respondent that the clause in the Constitution, namely, "or other valuable mineral deposits," falls within the rule of construction that when general words follow particular words the things mentioned generally must be confined to the matters incorporated in the particular words. That is to say, all things that may be contained within the general words must be *ejusdem generis;* that is, of the same class or kind of those particularly mentioned. In addition to this general rule there is also a further restriction upon general words which follow particulars by which the general words will not be held to include anything which is of a class superior to the class mentioned in the particular words. This rule or principle of construction is well established and is of frequent application, especially in penal or criminal statutes, but is not confined to that class. The doctrine of *ejusdem generis* is, however, only a rule of construction, and, like all rules, is resorted to only as an aid to the courts in arriving at the true intent of the lawmaker. These rules must not be applied so as to make them masters, since they are designed as servants merely. No rules of construction, however, can be permitted to override the fundamental principle underlying all rules which requires that all words contained within a statute must, if possible, be given their ordinary meaning, and that the intention of the lawmaker must be gathered from the language employed in the light of the context and of the subject-matter to which it is applied, and when such in-

tention is clear it must prevail notwithstanding some rules to the contrary.   By this we do not mean that where the ordinary meaning of the language employed would lead to an absurdity, or inflict great injustice, the ordinary meaning of the words should not be restricted or expanded, if necessary, to avoid an absurdity or an injustice; but this is only another way of stating that courts cannot assume that the lawmaker really intended to enact either absurd or unjust laws.   Keeping this principle in mind, what was the intention of the framers of the Constitution in adopting section 4 of article 13 above quoted ?   When we have once ascertained this intention, it is our duty to declare it whether we deem it wise or unwise, or well or ill adapted to any matters therein contained.   Is the clause, "or other valuable mineral deposits," to be restricted to deposits "containing or bearing gold, silver, copper, lead, coal," these being the things enumerated preceding the general clause, "or other valuable mineral deposits," which follows as an adjunct ? The first exception to the rule of *ejusdem generis* is that where the particular things enumerated are complete so that there remain no others of like kind, then the things that fall within the general words must be assumed to be of a different kind and not *ejusdem generis* with those enumerated.

Can this exception be applied to this case ?   It seems to us that it not only is proper to apply it, but that, in view of the conditions prevailing when the Constitution was framed and adopted, it must be applied.   These conditions, which are matters of common knowledge, were that gold, silver, copper, and lead were the only metals that were being mined and produced in large quantities in the then territory of Utah, and that coal, if lime and common rock be excluded, was the only nonmetallic product that was mined and produced in quantity sufficient to justify such a tax.   These enumerated products, therefore, were the only ones from which any considerable revenue could be derived by a tax on the net proceeds derived therefrom.   While large deposits of iron and other valuable mineral deposits existed, none were

commercially considered, except to a very limited extent. In enumerating the four metals, and in adding coal thereto, the framers of the Constitution manifestly did not intend to classify the minerals along the line of the metals; but, in naming the four metals and coal, simply enumerated those as the ones which were then being largely mined and produced, with the intention, however, that the method of taxation provided for in the section should apply to all "other valuable mineral deposits" whether metallic or nonmetallic. The fact that iron, which abounds in very large quantities in this state, was not mentioned, adds some force to this view. We can see no reason for not mentioning it, if it was not that it was not then produced as a commercial product. Its presence in large and valuable quantities was then well known. It may be conceded that, under the doctrine of *ejusdem generis,* iron would fall within the class of metals enumerated, although it also fell within the general terms of "all other valuable mineral deposits," because it is not a superior class, and is a metal, like the others specially enumerated. But if we are correct in assuming that the classification was not intended as a limitation, but rather for the purpose of simply naming the substances then produced in quantity sufficient to warrant the imposition of such methods of taxation, because the state would immediately derive considerable revenue therefrom, then the doctrine of *ejusdem generis* has no application, and the other valuable mineral deposits, whether metallic or nonmetallic must be taxed the same as the ones enumerated although not specially named. This view is strengthened somewhat from the fact that coal, a nonmetallic substance, was included with metals in the specific enumeration. Coal, no doubt, was specially mentioned because it, like the metals mentioned, was produced in large quantities in this state, and thus would yield some revenue on net proceeds. It is true that ordinarily the enumeration of coal would add some force to the contention that since coal, a nonmetallic product, was classed with metals,

coal was the only nonmetallic substance that was intended to be reached with the metals. If, however, we keep in mind the theory that the metals and coal were mentioned because they were the only substances that were produced in such quantities that would yield a considerable amount of revenue to the state, the contention that coal being specially mentioned was the only nonmetallic substance sought to be reached loses all of its force. Pursuing the foregoing theory further, the framers of the Constitution, after enumerating the metals produced in large quantities, added thereto coal also produced, and then included, and intended to include, all other valuable mineral deposits whether metallic or nonmetallic in the general clause, "or other valuable mineral deposits." This view derives additional force from what follows near the end of the section, namely, "and the net annual proceeds of all mines and mining claims shall be taxed as other personal property." Having thus enumerated the mines, mining claims, and mineral deposits that should be taxed at the purchase price only with the improvements thereon, which is as applicable to respondent's mining claims as to all others, the ores or mineral deposits were not to be taxed according to their value in the earth, but the net annual proceeds derived therefrom were to be taxed as such proceeds were obtained by the owners. If this was a fair and just method of taxation on metals and coal produced, why is it not equally fair and just with regard to all other mineral products? Certainly the difference between the two is not so great either in kind or in the methods employed in obtaining them that it would be either absurd or unjust to treat them both alike in a general system of taxation. We think that it is reasonably clear that the phrase "or other valuable mineral deposits," was not intended to contain minerals only *ejusdem generis* with the metals specially named, but that it was intended that all mineral deposits should be taxed in this way, and not only the metalliferous minerals and coal.

In adopting this construction, we think we are sustained by
the authorities. In speaking of the application of the doc-
trine of *ejusdem generis,* Sutherland on Statutory Construc-
tion, sec. 279, says:

"It (the doctrine) affords a mere suggestion to the judicial mind
that, where it clearly appears that the lawmaker was thinking of a
particular class of persons or subjects, his words of more general de-
scription may not have been intended to embrace any other than those
within the class. The suggestion is one of common sense. Other rules
of construction are equally potent, especially the primary rule which
suggests that the intent of the Legislature is to be found in the ordinary
meaning of the words of the statute. The sense in which general
words, or any words, are intended to be used, furnishes the rule of
interpretation,[1] and this is to be collected from the context; and a nar-
rower or more extended meaning will be given, according as the intention
is thus indicated. To deny any word or phrase its known and natural
meaning in any instance, the court ought to be quite sure that they are
following the legislative intention. Hence, though a general term fol-
lows specific words, it will not be restricted by them when the object
of the act and the intention is that the general word shall be understood
in its ordinary sense."

The foregoing text is well illustrated and supported by a
great number of decisions, among which are the following
well-considered cases: *Woodworth v. State,* 26 Ohio St.
196; *Foster v. Blount,* 18 Ala. 687; *State v. Solomon,* 33
Ind. 450; *Tisdell v. Comb,* 7 A. & E. (English Common
Law) 223, 788.

"The doctrine of *ejusdem generis* is but a rule of construction,"
says the Supreme Court of Minnesota, and is intended "to aid in the
ascertaining the meaning of the Legislature, and does not warrant a
court in confining the operation of a statute within narrower limits
than intended by the lawmakers. The general object of an act some-
times requires that the final general term shall not be restricted in
meaning by its more specific predecessors." (*Willis v. Mabon,* 48 Minn.
140, 50 N. W. 1110, 16 L. R. A. 281, 31 Am. St. Rep. 626.)

The following cases are to the same effect: *Webber v.
Chicago,* 148 Ill. 313, 36 N. E. 70; *Lent v. Portland,* 42
Ore. 488, 71 Pac. 645. The foregoing statement, it seems to

us, is most pertinent with regard to the meaning to be given to the phrase "or other valuable mineral deposits." To restrict this phrase so as to include no more than metalliferous deposits would, in view of what we have said about the production of metals in this state, practically rob the phrase of any meaning whatever. It would simply eliminate from consideration all other nonmetallic valuable mineral deposits of this state, of which there are a great number. To do this, as we read the constitutional provision, was manifestly not the intention of the framers thereof, nor do we think that such was the intent that the people had of it when they adopted the Constitution. The fact that in making reports of the net proceeds the Legislature required that the number of fine ounces of gold and silver and the number of pounds of copper and lead should be reported by the owners of the mines, while nothing was said about other deposits, is, to our minds, of but small significance. No provision in this regard is made with regard to coal, but the manner in which the cost of mining and reducing any mineral or coal deposit of a marketable condition is to be ascertained is provided for. Under this the net proceeds derived from a gypsum deposit is as easily ascertainable as the net proceeds from any metal or coal mine can be. The law, therefore, in this regard, is as applicable to gypsum or other valuable mineral deposits as it is to metalliferous deposits or coal. The contention that if the constitutional provision is held to apply to a deposit of gypsum because it is generically a mineral deposit, that it must likewise be held to apply to any clay or sand bank and to the waters of the Great Salt Lake is not directly involved in this case, and need not be considered at this time. It is enough for the present to determine that a gypsum deposit is within the constitutional provision, and as to whether any other particular one of the many mineral deposits is within the provision can be best determined when the question is actually presented. If we should now hold that any particular one fell within or without the provision, it would simply amount to a dictum and

hence of no binding force or effect. This case involves a gypsum deposit, and nothing else.

We have carefully read all the cases cited by council for respondent. Among those cited is the case of *Casher v. Holmes,* decided in the English courts of common law, and reported in 2 B. & M. 592. The report, however, contains no more than a very brief synopsis of the decision. It appears, however, that certain important duties were imposed on "copper, brass, pewter, and tin, and on all other metals not enumerated." While the ground on which the decision is based does not appear, it perhaps was, to some extent at least, based on the doctrine that where a class of persons or objects is specified, which is followed by a general term referring to persons and objects generally, no person or object superior to the class specified will be included within the general term. And thus it was held that gold and silver, being of a superior class, were not included within the term "other metals." This doctrine is not applicable to this case. Nor is the broader doctrine of *ejusdem generis* applicable as we have already pointed out. Apart from this, however, we have no means of ascertaining what the terms of the English act were upon which the court passed. It may well be that there was something in the history of English legislation upon the subject, or something in the act itself, that made it apparent that it was not the legislative intent to impose an important duty on the precious metals of gold and silver. It requires no very extended knowledge of political economy or of history to know that gold and silver constitute the metals upon which all nations rely for their medium of exchange, and that at no time did any nation discourage their importation, nor were they ever considered or classed as ordinary articles of trade or commerce with the other inferior metals. From these facts it may be readily inferred that a court would hesitate to include gold and silver within the general term under an act such as the one in question in that case. The other cases cited simply announce, illustrate, and

apply the general rules of interpretation, and none of them lays down any rule contrary to those we have aimed to follow in this opinion, but, upon the contrary, we think they are in strict harmony with what has been quoted from Sutherland and the decisions.

From what has been said it follows that the trial court erred in the conclusion of law, and in entering judgment for the respondent. In view that the facts are all conceded, and thus the question involved is one purely of law, and it appearing that the respondent cannot so amend its complaint as to state a cause of action in law, the judgment is reversed, and the cause remanded to the district court, with directions to vacate its conclusions of law and substitute others therefor in conformity with the views herein expressed, and when so modified to enter judgment dismissing the complaint; the appellant to recover costs.

McCARTY, C. J., and STRAUP, J., concur.