## SALT LAKE COUNTY v. UTAH COPPER CO.

(Circuit Court of Appeals, Eighth Circuit. November 12, 1923.)

No. 6163.

1. Taxation ⊜⇒317(1)—Of mining property under law of Utah.

Under the statutes of Utah, property generally is assessed by county assessors; but Const. Utah, art. 13, § 4, and the statutes enacted to carry it into effect, provide for the assessment of mines and mining claims by

the state board of equalization on the basis of their net annual proceeds. *Held* that, so long as a copper mine was in continuous operation and the tailings from which most of the copper had been extracted were held for retreatment, their assessment was within the jurisdiction of the state board of equalization, and they were not subject to assessment by county assessors.

2. **Taxation ⚖➣348—Of "net annual proceeds" of mining property under law of Utah.**

Under Const. Utah, art. 13, § 4, and Comp. Laws 1917, § 5930, providing for assessment of mines on basis of net annual proceeds, the "net annual proceeds" of a mine are the net proceeds of the sale of its product during the tax year.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Net Proceeds.]

3. **Courts ⚖➣366(1)—Federal courts follow decisions of state court in construction of state statutes.**

In the construction and application of the statutes of a state, the federal courts follow the decisions and opinions of the highest judicial tribunals thereof, in the absence of any question of the violation of the Constitution or laws of the United States.

4. **Taxation ⚖➣42(1)—Different classes of owners may be taxed by different methods and by different officers.**

It is not ordinarily undue discrimination to tax different classes of owners of different kinds of property by different methods and by means of different sets of officers.

5. **Taxation ⚖➣543(6)—Complaint in action to recover taxes paid held sufficient.**

Under Comp. Laws Utah, 1917, § 6094, authorizing a taxpayer to bring an action to recover from a county taxes which he deems unlawful, and which he paid under protest, a complaint is not subject to demurrer because it alleges generally that the levy and collection of the taxes were illegal and without authority of law, without specifying the grounds of illegality, which is matter of law.

6. **Taxation ⚖➣543(7)—Admission of evidence held not error in action to recover taxes paid.**

In an action by a mining company to recover taxes exacted and paid for certain years on tailings from its reduction plant, evidence tending to show continuous operation of the mine, that the tailings had been accumulated through a series of years and were held for further treatment *held* pertinent, and its admission not error.

In Error to the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

Action at law by the Utah Copper Company against Salt Lake County. Judgment for plaintiff, and defendant brings error. Affirmed.

Charles C. Richards, of Salt Lake City, Utah (Arthur E. Moreton and W. J. Mitchell, both of Salt Lake City, Utah, on the brief), for plaintiff in error.

A. C. Ellis, of Salt Lake City, Utah (Dickson, Ellis & Adamson, of Salt Lake City, Utah, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and BOOTH and FARIS, District Judges.

SANBORN, Circuit Judge. Section 6094 of the Compiled Laws of Utah of 1917 provides that in all cases of levy of taxes for public revenue which is deemed unlawful by the party whose property is taxed, or from whom such tax is demanded or enforced, such party may pay

under protest such tax to the officers designated and authorized by law to collect the same, and may bring an action in any court of competent jurisdiction against such officer, or against the county on whose behalf the same was collected, to recover the tax so paid under protest. Under this statute the Utah Copper Company, a corporation engaged in 1917 and 1918 and for many years preceding in mining and concentrating copper ore taken from its mine at Bingham, in Salt Lake county, and depositing and impounding the tailings therefrom on its land near its milling plant and reduction works at Garfield, in that county, deeming the taxes, amounting to $158,520, levied on account of these tailings in 1917 and 1918, and demanded of it, unlawful, paid them under protest, brought this action against Salt Lake county to recover them, and obtained judgment in its favor for $205,069.96. The county complains of this judgment.

[1] In 1917 and 1918, section 4 of article 13 of the Constitution of the state of Utah and the statutes of that state required all mines and mining claims to be taxed, unless the surface ground was used and had a separate value for other than mining purposes, at the price paid the United States therefor and required all the machinery used in milling, all property and surface improvements upon or appurtenant to mines and mining claims which had a value separate and independent of such mines or mining claims, and the net annual proceeds of all mines and mining claims to be taxed by the state board of equalization. Compiled Laws of Utah 1917, §§ 5864, 5929, 5930, 5931, 5932, 5933, 5934. The method of general taxation provided by the Constitution and statutes of that state was and is that the real and personal property in the state, not exempt, and for which no other specific method of taxation was prescribed, should be assessed by the county assessors at its true value in money and taxed by the taxing officers of the county uniformly in proportion to its value. Constitution of Utah, article 13, §§ 2, 3. These provisions of this Constitution and of these statutes adhere to the general rule that assessment and taxation of property in Utah shall be based on its true value in money, but they recognize the fact that it is impossible to ascertain the true value of mines and mining claims by this method of estimating the value of other property by the county taxing officers, and that the value of mines and mining claims for taxation purposes ought to be, and in Utah must be, ascertained and they must be taxed by the state board of equalization in proportion to their net annual proceeds. The defendant below, Salt Lake county, assessed and taxed these tailings at the value which its assessor estimated them to have, regardless of the fact that they are a part of the product and of the proceeds of the continuing operation of the plaintiff's mine, and the question which conditions the decision which must ultimately determine the rights of the parties to this litigation is: Are these tailings assessable and taxable according to the general method of taxation of other real and personal property in Utah, not the product of mines and mining, or are their assessment and taxation governed by section 4 of article 13 of the Constitution of Utah, and the statutes enacted to render that section effective? In this case these facts condition the answer to this question:

In 1917 and 1918, and for many years prior to that time, the plaintiff had been and still is continuously operating a large low-grade copper mine in the West Mountain district of Salt Lake county. The valuable metals extracted from the material there mined constitute about 1.2 per cent. copper. This crude material is of too low a grade to be commercially treated or to permit direct smelting, and it is necessary to concentrate it by the use of water and by means of milling and reduction works to the extent of extracting one ton of concentrates out of 19 tons of this crude material. There is neither sufficient water to conduct this concentration nor space in the vicinity of the mine at Bingham for the necessary milling and reduction works, and the nearest available site for these works where sufficient water is obtainable is at Garfield, in Salt Lake county, and there the plaintiff constructed its milling and reduction works, and has conducted and still conducts its operation of concentration. It has transported and was in 1917 and 1918 transporting by rail the crude material from its mine to these milling and reduction works, which are situated about 13 miles from the mine, and was there extracting its concentrates and impounding the remnant of the crude material, which constitutes these tailings, on its own land near its concentration plant. This process of concentration has extracted from 60 to 75 per cent. of the metallic contents of the crude material, and from 25 to 40 per cent. of those contents still remains in the tailings. The plaintiff has impounded and holds these tailings in the hope that the price of copper and the metallurgical art will so advance that it will be profitable to again treat them, and to extract from them still more net annual proceeds of its mine. The price of copper is the fact which most vitally conditions the realization of this hope, and in 1917 and 1918 it was such that the tailings could not profitably be again treated, and no net annual proceeds could be extracted therefrom.

The question recurs: Were these tailings, in the light of the facts which have been recited, taxable in 1917 and 1918 to the plaintiff in proportion to their value estimated by the county taxing officers; or were they taxable by the state board of equalization on the basis of their net annual proceeds? · There can be no doubt that the state of Utah intended to substitute, and by its Constitution and statutes in effect did substitute, the taxation by its board of equalization of the net annual proceeds of mines and mining claims for the taxation of such mines and mining claims in proportion to their value estimated by the taxing officers of the county and that it thereby exempted them from taxation by the latter. It seems certain that after the annual proceeds of this mine were taxed for 1917 and 1918 by the board of equalization, as they probably were, neither the mine itself nor the net annual proceeds thereof could be lawfully taxed again for those years by the taxing officers of the county. Nor does it seem doubtful that, if they were not so taxed by the state board of equalization, nevertheless they could not lawfully be taxed by the taxing officers of the county, because the state had vested the exclusive power to tax them in the state board of equalization.

The tailings for 1917 and 1918 were successively (1) a part of the plaintiff's mine, (2) a part of the crude material extracted from that

mine, and (3) a part of that material of lower metallic content separated by the process of concentration from that part of higher metallic content from which the net annual proceeds of the mine were derived, and the tax upon which paid the taxes on the mine and its contents for the years 1917 and 1918. Obviously these tailings could not be taxed by the taxing officers of the county while they were a part of the mine, or while they were a part of the crude material extracted from the mine, because the taxes on the net annual proceeds, if levied, paid the taxes on them for those years, and, if not levied, the taxing officers of the county were still without authority to levy taxes upon them. Nor does it seem probable or possible that the separation of these low-grade ores containing a metallic content of from 25 to 40 per cent. of the metallic content of the crude material held by the mining company, while it was still in active operation of its mine, in the hope that by again treating them it will at some time secure more net annual proceeds from its mine, could transfer the authority to assess and tax them from the state board of equalization to the taxing officers of the county, or subject them to taxation by the latter. And what has been said concerning the taxation of the tailings and the net annual proceeds of the mine for 1917 and 1918 is equally relevant to the taxation of the tailings and the net annual proceeds of the mine for the years preceding 1917.

[2, 3] Moreover, in the construction and application of the statutes of a state, the federal courts follow the decisions and opinions of the highest judicial tribunals thereof, in the absence of any question of the violation of the Constitution or laws of the United States, and we turn to the decisions of the Supreme Court of Utah relative to the question here under consideration which appear in Mercur Gold Mining Co. v. Spry, 16 Utah, 222, 229, 230, 52 Pac. 383; Nephi Plaster & Manufacturing Co. v. Juab County, 33 Utah, 114, 93 Pac. 53, 14 L. R. A. (N. S.) 1043; Mammoth Mining Co. v. Juab County, 51 Utah, 316, 170 Pac. 78. The case of Mercur Mining Company v. Spry, 16 Utah, 222, 229, 230, 52 Pac. 382, was decided before the statutes prescribing the method of ascertaining the "net annual proceeds of mines" were enacted, and the Supreme Court of Utah there held that section 4 of article 13 of its Constitution was not self-executing. The statutes of that state relative to the taxation of mines and mining claims are based on and were enacted pursuant to the opinion of the Supreme Court in that case.

Counsel for the county contend that, although the tailings here under consideration are a part of the proceeds of the mine, they may be taxed as other personal property, and that the statutes do not contemplate that such products must be converted into cash before the proceeds tax shall attach, but that the gross yield from the mine with its value should be reported for taxation. The answer is that in the Mercur Company Case the Supreme Court of Utah said:

"By the term 'net annual proceeds of the mine' is meant what is annually realized from the product of the mine over and above all the costs and expenses of obtaining such proceeds and converting the same into money." 16 Utah, 228, 52 Pac. 384.

And section 5930 of the statutes which were enacted to prescribe a method of ascertaining the net annual proceeds declares that the state-

ment of the owner or operator of his expenditures required in the preceding section must contain an account—

"of the actual expenditures of money and labor in extracting the ore or mineral from the mine, transporting the same to the mill or reduction works, and the reduction of the ore and the conversion of the same into money, or its equivalent, during the year."

In the Mercur Company Case the court, speaking of section 4 of article 13, of the Constitution, said:

"The effect of this provision of the Constitution was, not presently to tax the annual product of the mines, but to declare that such product should be taxed as provided by law." 16 Utah, 228, 52 Pac. 384.

"With respect to the taxation of the net annual product of a mine, it must have been contemplated that the product should be ascertained at the end of the fiscal year, and should not be simply estimated by the assessor on the basis of its net product the previous year. Nor could it have been intended that the assessment should be levied unless there was some net annual product to levy it upon at the end of the year." 16 Utah, 228, 52 Pac. 384.

"Section 4, art. 13, of the Constitution, requires that all net * * * products of all mines and mining claims shall be taxed as provided by law. This is a limitation on the power of the Legislature, so that, so far as the product is concerned, nothing can be taxed except the net annual product of the mine." 16 Utah, 229, 52 Pac. 385.

In Nephi Plaster & Manufacturing Co. v. Juab County, 33 Utah, 114, 93 Pac. 53, 14 L. R. A. (N. S.) 1043, the court held that placer mining claims upon which were large and valuable deposits of gypsum, some of which was extracted and manufactured into hard wall plaster, dental plaster, fertilizers, and other manufactured products, were taxable under section 4 of article 13 upon the net annual proceeds of the sale of such manufactured products.

And in Mammoth Mining Co. v. Juab County, 51 Utah, 316, 170 Pac. 78, the Mammoth Company between the years 1876 and 1890 had mined and placed upon its dump a large amount of low-grade ore. In 1913 it treated the ore in this dump and the state board of equalization assessed against that company as net annual proceeds of that treatment, under section 4, art. 13, of the Constitution, $40,000. The company complained because the trial court refused to allow in reduction of the proceeds its expenditures in the years previous to 1913 in mining and placing this low-grade ore on the dump, and the Supreme Court held that the mining company was limited by the law to an allowance of the amount of the expenditure that it made during the year 1913, when it received the net proceeds on which it was taxed. In its discussion of that question, however, it clearly expressed its opinion upon the legal issue under consideration in the case in hand. It said:

"The statute does not concern itself with costs or deficits that arose in any year, except those incurred during the year in which the net proceeds are obtained. It is not a question of whether the mine owner or operator gains net proceeds or net profits from his mine when considered as a business venture, but the only question is: Did the mine or mining properties yield net proceeds for the particular year in which they are assessed? Nor does it make any difference whether the ores are obtained from the mine or from a dump, if in fact they were at some time taken from the mine." 51 Utah, 321, 170 Pac. 79.

These decisions and opinions sustain the conclusions of the court below that, as the Supreme Court of Utah said in the Mercur Company Case, section 4, art. 13, of the Constitution "is a limitation on the power of the Legislature, so that, so far as the product is concerned, nothing can be taxed except the net annual product of the mine, * * * and only that which exists and has been ascertained as the annual net proceeds of the mine is to be assessed and taxed"; that the net annual proceeds of mines is what "is annually realized from the product of the mine, over and above all the costs and expenses, of obtaining such proceeds and converting the same into money"; that it could not have been "intended that the assessment should be levied unless there was some net annual product to levy it upon at the end of the year"; and that, as the Supreme Court of Utah said in the Mammoth Company Case, the only question is:

"Did the mine or mining properties yield net proceeds for the particular year in which they are assessed? Nor does it make any difference whether the ores are obtained from the mine or from a dump, if in fact they were at some time taken from the mine."

These tailings are a product of the plaintiff's mine. The limitation of the power of the Legislature by section 4 of article 13 of the Constitution prevented the existence of any authority or power in the taxing officers of the county to assess them or to levy taxes upon them for the years 1917 and 1918. No net annual proceeds were derived from them in 1917 or 1918, so that they presented nothing for assessment or taxation by the state board of equalization. The mine from which they were taken had not been exhausted in those years, the tailings had not been abandoned, the plaintiff was continuously operating its mine, extracting valuable ore from it, and depositing and impounding the tailings on its own land in the vicinity of its milling and reduction works, in the hope that the time would come when net annual proceeds of the mine could be derived from them, and there was no error in the conclusion of the court below that these tailings were not taxable during those years.

This conclusion has not been reached, nor the disposition of this case determined, until after the opinion of the Supreme Court of the United States in South Utah Mines & Smelters v. Beaver County, 43 Sup. Ct. 577, 67 L. Ed. 1004, delivered May 21, 1923, and the briefs and authorities of counsel in this case had been carefully examined and considered. But the tailings, the taxation of which was the subject of the controversy in the case which the Supreme Court decided, had been deposited partly by the plaintiff's predecessor and partly by the plaintiff in that case, commencing in 1903 and ceasing in 1914, when the mine became exhausted, and, excluding the tailings, worthless, and the concentrating mill, obsolete and largely dismantled. The plaintiff in this case has been and still is continuously operating its mine and its milling and reduction works, and depositing and impounding its tailings on its own land in the vicinity of its concentrating plant. The decision and opinion of the Supreme Court is neither conclusive nor persuasive in the case in hand, because, as said in that opinion, "But the difference between a mine from which ore is still being or still may be extracted and

net income derived, and one conceded to be an empty shell, with no present or prospective value whatsoever, is so obvious that the imposition of a tax upon the basis of their being, nevertheless, one and the same cannot be sustained with due regard for either law or logic," and because the opinions of the Supreme Court of Utah have in effect ruled the issue in the case now before us.

[4] Counsel for the county have forcibly and persuasively argued that, if these tailings had been sold to a third person, they would have been taxable at their value by the taxing officers of the county, and that to exempt them from such taxation constitutes undue discrimination. It is not, however, ordinarily undue discrimination to tax different classes of owners of different kinds of property by different methods and by means of different sets of officers, and, so long as the plaintiff holds these tailings in the customary course of its active and continuous operation of its mine, it is, under the Constitution and statutes of Utah, a member of a different class for purposes of taxation from that class which contains the supposed purchaser of the tailings without a mine and without mills, and it is lawfully taxable on its mine and product by the different method prescribed by the law, without unlawful discrimination for or against those taxed by the method prescribed for general taxation.

They argue that these tailings are taxable by the taxing officers of the county, and not by the state board of equalization, because they are personal property; but, if they are personal property, they became such when they were first separated from the real estate of which they were a part, when they were first broken away and raised from the mine, and they remained personal property while they were transported to the concentrating works and thereafter. But their separation from the real estate clearly did not subject them to taxation by the county officers, because they were a product of the mine, and section 4 of article 13 prevented the county officers from receiving the power or authority to tax them, and granted that power exclusively to the state board of equalization.

Counsel insist that, after these tailings are once reported for purposes of taxation as a part of the product of the mine, they become immediately subject to taxation at their value as personal property by the county taxing officers; but they were one of the products of the mine, were a part of the crude ore extracted from the mine, milled and concentrated to get the annual proceeds which are taxed by the state board, and because as such they were by the method lawfully prescribed thus taxed by the state board of equalization, and, because, after the completion of that process and that taxation, they were not taxable again until annual net proceeds of the mine were again produced from them, they were not taxable in 1917 and 1918 by the taxing officers of the county at their estimate of their value. The court is not persuaded that there was any error in the determination by the court below of the main issue in this case.

[5] The question of law, the answer to which settles the rights of the parties to this litigation, has been first considered, because it inheres in all the other issues, and after its answer they become matters of mere method and practice. It is assigned as error that the court below re-

fused to grant a motion of the defendant to strike out certain portions of the complaint, and that it overruled the defendant's demurrer thereto on the ground that the complaint did not state facts sufficient to constitute a cause of action. The grounds of the motion and of the demurrer were that, while the complaint stated (a) that the plaintiff was the owner and operator of the mine and milling and reduction works, and the tailings therefrom, and was, in 1917 and 1918, operating the mine and works and impounding the tailings upon its own land, (b) that the treasurer and tax collector of the defendant county collected $158,520 from the plaintiff as and for taxes levied and assessed on these impounded tailings and the plaintiff paid them under protest, and that (c) the levy, assessment, and collection of these taxes was illegal and wholly without authority of law, in that neither the defendant, nor its treasurer and tax collector, nor any other person whatever, had any authority to levy and assess or collect any taxes on these tailings for these years, and the taxes were illegal and void, nevertheless the averments of the complaint under (c) of the lack of authority of the taxing officers to levy or collect these taxes ought to have been stricken out, and the demurrer ought to have been sustained, first, because the complaint did not state more particularly why the taxing officers had no authority to levy and collect these taxes; and, second, because such officers had plenary authority to levy and collect them under the Constitution and laws of the state of Utah. The second ground for this motion and demurrer has already been considered and held untenable. Nor are we convinced that there was any error prejudicial to the defendant in the court's refusal to grant the motion or to sustain the demurrer on the first ground. Section 6094 of the Compiled Laws of Utah of 1917 expressly authorized the plaintiff to bring this action in any court of competent jurisdiction to recover of the county any taxes which it deemed unlawful and paid under protest. The legal presumption is that all parties know the law. The provisions of the Constitution and laws of Utah relevant to the legality of these taxes must have been well known to the county, to its officers, and to its counsel. When that Constitution and those laws were applied to the facts clearly alleged in the complaint, the reason for the plaintiff's claim that the taxes on the tailings were levied without authority was obvious, and there was no error in the denial of the motion and the overruling of the demurrer. Mining Company v. Juab County, 22 Utah, 395, 410, 62 Pac. 1024; Bassett, County Treasurer, v. Utah Copper Co., 219 Fed. 811, 135 C. C. A. 481.

[6] Mr. Tempest, a witness for the plaintiff, was its assistant chief engineer, had been in its employment almost 12 years, and was familiar with its mine, property, mills, and works. It is assigned as error that, over the objections and exceptions of the defendant, the trial court received his testimony to the effect that the crude material taken from the plaintiff's mining property averages about 1.2 per cent. copper; that it is necessary to concentrate it, so that one ton of concentrates is obtained from 19 tons of crude material before it could be sent to the smelter and made commercially profitable; that there was neither sufficient water to conduct the concentration nor sufficient space for the necessary milling and reduction works and the tailings in the vicinity of the mine, and that the nearest available site therefor was at Garfield,

13 miles distant; that the tailings have been accumulating there for many years; that the tailings for one year have been piled on those of previous years; that these tailings contain from 25 to 40 per cent. of the metallic contents of the crude ore; that the ability profitably to treat again these low-grade ores depends vitally on the price of copper, and, generally, upon the state of the metallurgical art; that the price of copper was such in 1917 and 1918 that they could not have been profitably treated; and that, in the process of mining, the crude ore material taken from the mine has been and is being loaded into cars at the mine, transported to the milling and reduction works, dumped into the bins, concentrated, and the tailings piled on those previously impounded in the vicinity of the mills. The objections to this testimony were that it was immaterial and irrelevant to the issues in the case. But it tends to prove the continuous, reasonable, and customary operation of the process of mining and concentrating the crude ore and depositing the tailings year after year, their metallic contents, the necessity of transporting the crude ore from the mine to the mills and concentrating it, and the impossibility of obtaining further net annual proceeds from the tailings in the years when they were taxed, and there was no error in the admission of this testimony.

The result of the entire matter is that the court finds no error prejudicial to the defendant in the trial of this case, and the judgment below must be and it is affirmed.