Murray v. Allred.

MURRAY v. ALLRED.

(*Knoxville.*  November 23,  1897.)

1. DEED.  *Reservation of minerals includes petroleum oil.*

   Petroleum oil is a mineral within a reservation by deed of "all mines, minerals, and metals in and under the land." (*Post, pp.* 101, 117, 118.)

2. SAME.  *Reservation of minerals includes natural gas.*

   Natural gas is a mineral within a reservation by deed of "all mines, minerals, and metals in and under the land." (*Post, pp.* 115, 116, 118.)

3. ADVERSE POSSESSION.  *Of lands not adverse to owner of minerals therein.*

   Possession of land by the owner of the surface is not adverse to the owner of minerals therein, when the land is used merely for agricultural purposes, without any denial of the right to the minerals or any assertion of claim inconsistent therewith. (*Post, pp. 119, 120.*)

---

FROM  FENTRESS.

---

Appeal from Chancery Court of Fentress County. T. J. FISHER, Ch.

L. T. SMITH and W. T. MURRAY for Murray.

JAMES A. ALLRED for Allred.

WILKES, J.  This cause was decided for defendant by the Chancellor, and his decree was reversed

Murray *v.* Allred.

by the Court of Chancery Appeals, and the cause is now before us on appeal of defendant and assignment of errors.

The very interesting question is presented whether petroleum oil is a mineral or not. It arises upon the construction of a deed which conveyed certain lands, reserving to the grantor "all mines, minerals, and metals in and under the land." Subsequent conveyances were made to third persons without reservation, and the present owners hold under a deed conveying in fee simple and making no reservation and no reference to "mines, minerals, and metals in and under said land."

The Chancellor was of opinion that petroleum was not embraced in the term "minerals." The Court of Chancery Appeals reversed this holding in a very exhaustive, elaborate, learned, and able opinion, and cite the dictionaries, legal and otherwise, the encyclopedias, and many works of science, and a large array of legal authorities holding to the same effect, and they state that, after a most exhaustive search, they have been able to find but one case holding a contrary doctrine. We can neither elaborate nor improve upon the holding of the Court of Chancery Appeals, and are content to affirm their holding and adopt their opinion as our own.

It is next said that the present owners are protected in their fee simple title to the land by the statute of limitation of seven years. The cause was heard upon an agreed statement of facts, and the

agreement upon this feature of the case is that defendants and those under whom they claim have had the adverse possession of the land for more than seven years. Inasmuch as the complainant's vendor, Rodgers, is one of the parties through whom defendants claim, and the agreed statement of facts does not show how long the land has been held since complainant parted with the title, the facts necessary to sustain the plea are not made out. In addition, it is well settled that one person may own the surface or soil and another the minerals and mines and metals, and even the water, and there may be different owners for the several different strata under the earth. In order to make a holding adverse to one who has reserved or had granted to him the "mines, minerals, and metals," there must appear to have been some denial of his right or assertion of claim inconsistent with his right. This does not necessarily appear when a party uses the land merely for agricultural purposes, a use entirely consistent with the right to mine under the soil by another.

Upon all the points raised we are of opinion the Court of Chancery Appeals is correct, and their decree is affirmed, and the opinion of that Court, delivered by Judge M. M. Neil, is appended and made the opinion also of this Court.

The following is the opinion:

"Neil, J. The questions in this case arise from the following agreed state of facts:

"'We, William T. Murray, as complainant, and

James A. Allred, as defendant, have a controversy over certain rights in the tract of land hereinafter described, which we desire to settle by an agreed case, made upon the following agreed state of facts, which case we agree to submit to the Chancery Court at Jamestown for a decision. In this case the following facts are agreed, to wit:

" ' 1. It is agreed that John B. Rodgers, on the twenty-fourth day of October, 1853, sold and conveyed to Mathias Wright a certain tract of land in the thirteenth civil district of Fentress County, Tennessee, bounded and described as follows [here described], in which deed said John B. Rodgers reserved to himself, his heirs and assigns, all mines, minerals, and metals in and under said land. Said Wright conveyed said land by general warranty deed, without any reservation of said mines, minerals, and metals, and whatever title said deed communicated under the facts hereinafter set out, passed to the defendant, James A. Allred, to the portion claimed by him by regular chain of conveyances from Rodgers, through Wright and others, which purported to convey an estate in fee, except the deed from Rodgers to said Wright, which reserves the mineral interest as above stated. And said Allred and those through whom he claims, have been in the actual, open, and notorious possession of said land, under color of title, for more than seven years, claiming adversely to the world to the extent of their title papers, which definitely identifies the land intended

to be conveyed, but had not been operating, or intending to operate, in any mining business on said land since the date of the deed from John B. Rodgers to Wright; neither has any of his vendors attempted to mine on said land, or drill for petroleum oil or natural gas. There is no mineral in, under, or on said land, unless petroleum oil or natural gas is held to be such. That petroleum oil had been discovered in White County, Tennessee, and in Wayne County, Kentucky, or Scott County, Tennessee, at what is known as the Martin Beaty well, prior to the deed from John B. Rodgers to Mathias Wright, above referred to. And there are petroleum oil springs in the vicinity of this land, which had been discovered at the date of said deed from Rodgers to Wright.

" ' 2. That said John B. Rodgers, during his life, and his heirs after his death, have claimed said mines and minerals and metals, including petroleum oil and natural gas, until the same passed out of them and passed into William T. Murray by judicial sale, who now owns whatever title they owned in said land before said sale.

" ' 3. The said William T. Murray, by his agent, went on to said portion of the land last mentioned in said Rodgers' deed, claimed by said Allred, and proposed to drill for petroleum oil and natural gas, and was refused the right to do so by said Allred, who conveyed the same to one Lewis Choate, and warranted the title, the said Allred contending that

complainant had no interest in said land, (1) because the words mines, minerals, and metals do not include petroleum oil and natural gas; (2) if they did, the title of said mines, minerals, and metals has long since been barred by the adverse holding under said deeds.

" ' 4. Complainant, Murray, contends that petroleum oil and natural gas are included in the words mines, minerals, and metals, and especially so as there is nothing else for the reservation to operate upon, and that the possession of the said Allred and those through whom he claims does not extinguish the title of the said mines, minerals, and metals, (1) because the facts stated, which are relied upon to effect the bar of the statute of seven years, are not sufficient to establish the character of adverse holding that would effect a bar of his rights or perfect the title of defendants; (2) because their possession was consistent with the complainant's title; (3) the said Murray contends that no cause of action would accrue in such case until the adverse holder invaded mineral rights, and that the cultivation of the soil was not such invasion, and therefore no statute of limitations runs as to said reservation.

" 'And it is further agreed that the Hon. T. J. Fisher, Chancellor of the Fifth Chancery Division of the State of Tennessee, may pass upon said facts and render such decree as the law and the facts may warrant. The Chancellor and the Supreme Court, in case of appeal, will consult any and all

scientific works and definitions of the words petroleum oil and natural gas, as well as such legal authorities as are found to aid them in the determination of the question upon the state of facts submitted.' Proper affidavit was attached.

" Upon this state of facts, the Chancellor decreed as follows : That the words mines, minerals and metals did not include oil and gas; also, that there had been seven years adverse holding under the deeds purporting to convey an estate in fee, and this vested the defendant with a perfect title in fee, including the title to oil and gas, and that the adverse holding of James A. Allred and those under whom he claimed had extinguished the title of John B. Rodgers, claiming under the adverse reservation as to the mines, minerals, and metals. He thereupon dismissed complainant's case, and rendered judgment against Murray for the costs. An appeal was prayed and granted, and errors were assigned as follows:

" ' (1) The Chancellor erred because he did not find, as a matter of law, that the deed from Rodgers to Wright expressly reserved to himself all of the petroleum oil interest in the land conveyed, and that by the subsequent judicial sale Rodgers' title in the same vested in complainant.

" ' (2) The Court erred because he did not hold, as a matter of fact, viz.: It not appearing at what time Wright sold the land, and consequently it not appearing how much of the time that the land was

adversely held was by Wright under his deed from Rodgers, which deed made the reservation, therefore, it does not appear, as a fact of record, that the defendant has held possession of the land for seven years next before this suit was brought, under deed purporting to convey the entire estate in the land; this fact not affirmatively appearing, the defense of the statute of limitations must fail.

" '(3) The Court erred because it does not hold that, as a matter of law, the possession of the defendants was consistent with complainant's title, and that there being a double ownership in the land, no cause of action could accrue in his favor so long as the owner of the surface only exercised his legal rights. The statute of limitations does not begin to run until the mineral rights in the land were invaded.'

" The first question to be determined is whether petroleum oil is included within the language of the reservation of mines, minerals and metals.

" In the Century Dictionary petroleum is defined: 'An oily substance of great economical importance, especially as a source of light, appearing naturally oozing from crevices in rocks, or floating on the surface of water, and also obtained in very large quantities in various parts of the world by boring into the rock; rock-oil.'

" ' Various opinions have been expressed concerning the origin of petroleum,' says Prof. S. F. Peckham, in the American Cyclopedia. 'Until quite re-

cently all of these theories were based upon the assumption that it had been derived from vegetable or animal organisms. Some have supposed that it is the product of the decomposition of woody fibre, by which more of the carbon and less of the hydrogen has been evolved than by the decomposition which has produced coal. Again, it has been supposed to be the product of the natural distillation of pyrbituminous shales and coals. Lesquereux attributes its origin to the partial decomposition of low forms of marine vegetation. Berthelot has advanced the theory that by the complex chemical changes at present taking place in the interior of the earth, petroleum is continually set free. It may be assumed that petroleum is a normal or primary production of the decomposition of marine or vegetable organisms, chiefly the former, and that nearly all other varieties of bitumen are products of a subsequent decomposition of petroleum, differing both in kind and degree. The occurrence of petroleum in the lower palæozoic rocks of Pennsylvania and Canada, which contain no traces of land plants, shows that it has not in all cases been derived from terrestrial vegetation, but may have been formed from marine plants or animals, an opinion further strengthened when we find in the rocks of the tertiary age, in which fossil remains of the higher marine animals occur in abundance, a petroleum comparatively rich in nitrogen.' It is shown, also, in the same authority, that petroleum is procured by a process of mining—that is,

by the sinking of wells. It ·is said the productive wells vary greatly in depth. In some, large supplies have been afforded at sixty and ·seventy feet, and in others at greater depths to over one thousand feet. It is said that most of the oil is obtained from wells over one hundred and eighty · feet deep; that shallow wells, exhausted by pumping, are successfully made to yield again by sinking them deeper; that the oil is found at several zones or oil-producing depths; that the pumps are sunk deeper into the well as the supply goes down.' And he continues, 'It is observed that if the pumping is interrupted for a day the product obtained when it is renewed ·will be water which is more or less salt. At some wells the flow of water has continued during several days' pumping before the oil was recovered. This never seems to fail entirely, unless it be from some obstruction arresting the flow, and then recourse is had to sinking deeper or enlarging the bore of the hole. Salt water commonly comes up with the oil, and is separated from it by standing in the vats into which the products are received. The proportion of this oil is very variable, and the quantity of the oil pumped from a single well is far from being regular. Sometimes the oil, when first struck, rushes up with great violence, by reason of the carburetted hydrogen gas that accompanies it. This produces a spouting or flowing well, from some of which the yield has been more than one thousand barrels a day for a long time; but the

quantity gradually diminishes until they cease to be flowing wells, and they are then pumped. In a few instances the oil has leaped forth with such violence as to be beyond control, and immense quantities have been lost. These fountains of oil have sometimes taken fire, producing terrific conflagrations and presenting scenes of appalling grandeur.' "

" Clearly, from this description of the substance, it could not, in any sense, fall under the terms metal or metallic. The question, then, to be determined is: Does it fall within the term ' mines and minerals ? ' "

" In 2 Rapalje & Lawrence's Law Dictionary, 821, it is said: ' In the most general sense of the term, minerals are those parts of the earth which are capable of being got from underneath the surface for the purpose of profit. The term, therefore, includes coal, metal ores of all kinds, clay, stone, slate, and caprolites. (Surface means that part of the land which. is capable of being used for agricultural purposes. *Midland Rail Co.* v. *Checkley*, L. R., 4 Eq., 19; *Heat* v. *Gill*, 7 Ch., 669; *Attorney General* v. *Tomblin*, 5 Ch. D., 762.) A mine is a work for the excavation of minerals by means of pits, shafts, levels, tunnels, etc., as opposed to a quarry where the whole excavation is open. While unreserved, minerals form part of the land, and as such are real estate. When severed, they become personal chattels.'

" In 15 Am. & Eng. Enc. L., 500, the fol-

lowing occurs: 'Mineral originally signified that which is obtained from a mine, from underground mining as distinguished from that which is quarried. The term is not limited to metallic substances, but includes salt, coal, paint stone and similar substances.' Citing, on the last point, *Hartwell* v. *Camman*, 2 Stockton's Ch. (N. J.), 128 (S. C., 64 Am. Dec., 448).

"In that case the question was whether the mineral stone paint passed under the terms 'mines and minerals.' Upon this question the Court, in that case, says: 'The character of the substance of stone paint, as the witness called it, is given in the bill, and the correctness of the description there given is admitted in the answer and confirmed by the evidence. It is a substance similar in general appearance to red shale, so soft as to be easily cut with a knife when first excavated, but differing in appearance from the surrounding earth. It is found in regular strata or bowlders of different sizes. It hardens when exposed to the air, and when broken up and ground, it is used as a paint, and is valuable for that purpose. The manner in which it is procured from the earth, and its particular location below the surface, are particularly described by a witness who was the foreman in carrying on the works. They commenced working in an old shaft which had been used for raising copper ore. As they proceeded with the excavation, the depth of the paint stone was about one foot in eight or ten, perhaps a little

more.    At the point of the pit opposite ·to the side
at which the excavation was commenced, the paint
stone was from eighteen to twenty feet from the
surface of the earth.    The work was carried on by
making regular mine shafts of timber, one of which
was extended about fifty-six feet in length, and pen-
etrated about twelve feet into the mountain beyond
the open pit; others were made very similar in char-
acter.    The stratum of paint stone, in the largest pit
was found to vary from six to fifteen feet in thick-
ness.    The stratum was uniform, increasing in thick-
ness as progress was made into the mountain.    It
does not crumble, like red shale, but comes off
in square pieces.    It is ground in a mill, and
is fit for use as a paint by mixing it with
oil.    Its value is from $20· to $30 per ton.
Prof. Doremus is the only scientific witness exam-
ined.    He says: "It may be called an argillaceous
sandstone, alumina and silica being the prominent
ingredients; it is not an ore of iron.    This comes
under the head of argillaceous rocks.    I wish to
distinguish these classes from ores or metalliferous
rocks.    The position of this paint material as it
lies in the mountain is not in veins, but is in strata.
The extracting of this material, as I saw it there,
would not be called mining.' "

    " ' The analysis,' the Court continues, ' only es-
tablishes the fact that it is not a metalliferous ore.
If the terms, mines and minerals, used in the deed,
could, by any fair construction, be confined to me-

tallic substances, the question involved would be of
easy solution; for the metallic property found in
this paint stone is so small that, for the purpose
of extracting the metal, it is of no value. But I
do not think the terms should be confined to the
metals or metallic ores. I cannot doubt if a strata
of salt or even a pit of coal had been found, they
would have passed under this grant.

" ' Can this stone paint, then, be fairly and nat-
urally embraced in the term mineral? It is a body
which is destitute of organism, and which naturally
exists within the earth. It is below the surface,
distinguished from the ordinary earth. It is in
strata, and is acquired by ordinary means of mining.
Also, Professor Doremus says that it is not in veins,
but in strata, and that he would not call the mode
of extracting it mining, yet this test of it would
exclude salt from the class of minerals, for salt, too,
is found in strata, and not in veins, and is obtained
by shafts, and by the same mode of operation by
which this matter is excavated from the earth. It
is valuable for its mineral properties, and by a
cheap and easy process of grinding is converted into
a merchantable article adapted to the mechanical and
ornamental arts. It is embraced in the definition
given by men of science to the term mineral. In
Bakewell's Mineralogy, p. 7, it is said, 'The term
mineral in common life is generally applied to de-
note substances dug out of the earth or obtained
from mining.' In Cleveland's Mineralogy, p. 1, the

16 P—8

definition is given thus: 'Minerals are those bodies which are destitute of organism, and which naturally exist within the earth or its surface.' My conclusion is that this paint stone passed by the grant, and that the defendants have the right to excavate and use it, and convert the same to their own use.'

"In a note to the case of *Dunham* v. *Kirkpatric*, appearing on page 698 of 47 Am. Rep., the following appears: 'Freestone is a mineral within a reservation in a deed. *Bell* v. *Wilson*, L. R., 1 Ch., 303. Coal oil is a 'mineral product.' *Thompson* v. *Noble*, 3 Pittsb., 201. Petroleum is a 'mineral, and a part of the realty.' *Stoughton's App.*, 88 Pa. St., 198. Coal is a 'mineral.' *Henry* v. *Lowe*, 73 Mo., 96. In *Tucker* v. *Linger*, Eng. Ct. App., 46 L. T. (N. S.), 894, it was held that flint stones, turned up by the plow in the course of husbandry, were 'minerals' within a reservation to the lessor of 'mines and minerals, and quarries of stone, brick-earth and gravel pits.' This holding was affirmed by the House of Lords. 8 App. Cas., 508. In *Ross* v. *Wainman*, 14 M. & W., 859, the Court said that the word, 'though more frequently applied to substances containing metals, in its proper sense, includes all fossil bodies or matters dug out of mines.' And in *David* v. *Roper*, 3 Drew., 294, it was restricted to such products as are worked by means of mines. More recently, however, in *Hext* v. *Gill*, L. R., 7 Ch. App., 699, the natural meaning of the term was said to be: "Every substance

which can be got from underneath the surface of the earth for the purpose of profit." Again, it has been held to include beds of china clay, while on the other hand, freestone, quarries of limestone and clay and sand, respectively, have been decided not to be 'minerals.' *In Re Dudley's Settled Estates*, Ch. Div., it was held that a lease of salt works, where the brine was pumped from the earth and was made into salt, was not a lease of minerals.'

"In the case of *Williamson* v. *Jones* (W. Va.), reported in 25 L. R. A., 222, the following language is used by Mr. Justice Holt: 'The authorities now very generally—universally, so far as I have examined them—hold petroleum to be a mineral, and as much a part of realty as timber, coal, or iron ore, except that, in proper cases, its mobility as a subterranean liquid must be taken into consideration, as in the case of salt water, etc. The Courts of the State of Pennsylvania have had many cases, some involving rights of great value, in which the point arose, and have examined the question thoroughly, considering it with great care with reference to its being property where it is found, and its character and nature in general as property.'

" 'Oil is a mineral, and, being a mineral, is a part of the realty.' *Funck* v. *Haldeman* (1866), 53 Pa., 229, 249.

"In the case of *Westmoreland & Cumbria Natural Gas Co.* v. *De Witt*, 5 L. R. A., 731 (130 Pa., 235), the Master said: 'Gas is a mineral, and while

*in situ* is a part of the land, and therefore posses-
sion of the land is possession of the gas.' After
quoting this, the Court said: 'This deduction must
be made with some qualifications. Gas, it is true,
is a mineral with peculiar attributes which require
the application of precedents arising out of ordinary
mineral rights, with much more careful consideration
of the principles involved than the mere decision.
Water is also a mineral, but the decisions in ordi-
nary cases of mining, etc., have never been used as
unqualified precedents in regard to flowing, or even
percolating, waters. Water and oil, and still more
strongly, gas, may be classed by themselves, if the
analogy be not too fanciful, as minerals *feræ naturæ.*
In common with animals, and unlike other minerals,
they have the power and tendency to escape with-
out the volition of the owner. Their fugitive and
wandering existence within the limits of a particular
tract, is uncertain, as said by Chief Justice Agnew,
in *Brown* v. *Vandergrift,* 80 Pa., 147, 148. They
belong to the owner of the land, and are a part of
it so long as they are on or in it, and are subject
to his control; but when they escape and go into
other lands, or come under another's control, the
title of the former owner is gone.'

"We have found only one authority opposed to
the conclusion that petroleum is a mineral. That is
the case before referred to of *Dunham* v. *Kirkpat-
rick,* 101 Pa. St. Rep., 36 (S. C., 47 Am. Rep.,
696). The great weight of authority is not only op-

posed to that case, but it seems to us to proceed upon false principles. The ground of the decision as stated in the opinion, is that, by the bulk of mankind, nothing is considered as mineral except such things as be of metallic nature—such as gold, silver, copper, lead, etc. That in the popular estimation, petroleum is not regarded as a mineral substance any more than is animal or vegetable oil, and that it could only be classified as such in the most general and scientific sense. So, in the light of this assumed general view of the bulk of mankind, petroleum was held not to fall within a reservation as to minerals. We, think, however, that the true meaning of the word mineral, as well as its meaning among the bulk of mankind, must be determined from dictionaries and other similar authorities. We do not think that the bulk of mankind could be regarded as holding that the word mineral applied only to metals. This case seems to be opposed in principle by the later case of *Gill* v. *Weston*, 110 Pa. St. Rep., 313, where petroleum was held to be a mineral substance, in construing the Pennsylvania Act of 1855, concerning the mortgaging of terms on mining lands. The Court said in that case, '.It is a mineral substance obtained from the earth by the process of mining, and land from which it is obtained may, with propriety, be called mining lands.'

"In the light of these authorities, we are bound to hold that petroleum is a mineral, and that it falls within the terms of the reservation in the deed

referred to in the foregoing case. The same is true of natural gas. We are of the opinion that the first assignment of error, therefore, is well taken. We are of the opinion, also, that the second assignment of error is well taken. To resolve the point raised by this assignment of error, we must construe the agreed state of facts. From this state of facts, it appears that Rodgers conveyed the land with the mineral reservation on the twenty-fourth day of October, 1853, to Mathias Wright, and that Wright conveyed the land by general warranty deed, without any reservation, to some third party, and then it passed through a series of conveyances to Jas. A. Allred; but the date of the deed made by Wright is not given, nor the date of any other deed, nor how long Allred held after Wright's deed. It thus does not appear from the agreement that there was seven years' adverse possession from the date of the deed of Mathias Wright. The agreement is that Allred and those under whom he claims have been in the actual, open, and notorious possession of the land, under color of title, for more than seven years, claiming adversely to the world to the extent of their title papers, which definitely identify the land intended to be conveyed. Within the expression, 'those under whom he claims,' is not only included Wright, but Rodgers. Therefore, it is impossible to say that there was seven years of adverse possession from the deed made by Wright to the third person forward.

" We are of the opinion, also, that the third assignment of error is well taken. In mineral lands the surface, as adapted to cultivation, may be separated from the right to dig under its surface for ore, and one person may hold one of these rights, while another holds the right of the other. *Sherrod* v. *Chadwick*, 8 Iowa, 463; *Caldwell* v. *Fulton*, 31 Pa. St. Rep., 475. So, the possession of the soil by the owner for the purpose of tillage, gives him no possession of the gas under the surface, or of the other minerals. *Westmoreland* v. *De Witt* (Pa.), 18 L. R. A., 731; *Chartier's Black Coal Co.* v. *Mellan* (Pa.), 18 L. R. A., 702. In this case it is said: ' The mining of coal and other minerals is constantly developing new questions. Formerly a man who owned the surface owned it to the center of the earth; now the surface of the land may be separated from the strata underneath it, and there may be as many different owners as there are strata. *Lillibridge* v. *Lackawana Coal Co.*, 143 Pa., 293 (13 L. R. A., 627). . . . In the early days of the common law, the attention of buyers and sellers, and therefore the attention of the Court, was based upon the surface proper, and who owned the surface owned all that grew upon it and all that was buried beneath it. His title extended to the clouds and downward to the center of the earth. The value of his estate lay, however, in the arable qualities of the surface, and, with rare exceptions, the income of it was agriculture. The comparatively recent develop-

ment of the science of geology and mineralogy, and the multiplication of mechanical devices for penetrating the earth's crust, have greatly changed the uses and the values of - lands. Tracts that were absolutely valueless, so far as the surface was concerned, have become to be worth many times as much per acre as the best farming lands in the commonwealth, because of the rich deposits of coal or iron, or oil or gas, known to underlie them at various depths. These deposits, however, are sometimes found beneath well cultivated farms, so that the surface has a large market value apart from the value of deposits of coal or iron or other minerals under .it. In such cases, the owner is rarely able to utilize the lower strata of wealth to which he has title, and, for this reason, he sells them to some person or corporation to be mined and to be moved. So it often happens that the owner of a farm sells the land to one man, the iron or oil or gas to another, giving to each purchaser a deed or conveyance in fee simple for his particular deposit or stratum, while he retains the surface for cultivating purposes precisely as he held it before. The severance is complete for all legal and practical purposes. Each of the separate layers or strata becomes a subject of taxation, of incumbrance, levy, and sale, precisely like the surface.' "

The result is that the decree of the Chancellor must be reversed with costs, and a decree entered here affirming the decree of the Court of Chancery Appeals for the complainant in accordance with this opinion.