LUSE et al. v. BOATMAN et al.   (No. 9157.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 15, 1919. Rehearing Denied Dec. 13, 1919.)

MINES AND MINERALS ⬳55(5)—RESERVATION OF "MINERAL" WITH RIGHT TO "MINE" INCLUDES GAS AND OIL.

Reservation in deed of all the "coal and mineral," with the right to enter and "to mine and remove the same," *held* to include oil and gas, oil and gas being minerals, and the term "mine" being broad enough for the purpose of reaching and extracting oil or gas, regardless of means to be used.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Mine; Mineral.]

Appeal from District Court, Eastland County; Joe Burkett, Judge.

Action by James Wesley Boatman against R. G. Luse and others, in which J. B. Ammerman and another intervened. Judgment for plaintiff and interveners against defendants, and defendants appeal. Reversed and rendered for defendants.

Scott & Brelsford, of Eastland, T. L. Foster, of Beaumont, and S. W. Marshall, of Dallas, for appellants.

Butts & Wright, of Cisco, for appellees.

BUCK, J. This suit was filed by appellee James Wesley Boatman, in form of trespass to try title, against R. G. Luse and J. E. Luse for the recovery of 80 acres of land, being the N. ½ of the S. W. ¼ of section 490, Southern Pacific Railway Company survey, situated in Eastland county. An amended petition was filed making the Sun Company a party defendant, and later J. B. Ammerman and J. J. Butts intervened, setting up a claim to certain mineral rights in 20 acres out of the 80 acres aforesaid, under a lease contract with Boatman. Defendants answered, claiming all the mineral rights in

said land, and the right of ingress and egress to mine, develop, and extract the minerals to be found therein and thereunder, particularly oil and gas. In a trial before the court judgment was rendered in favor of the plaintiffs and interveners and against the defendants.

The one question presented below and in this appeal is as to the proper construction of the mineral reservation in a certain deed from R. G. Luse to the Cisco Land, Coal, Manufacturing & Live Stock Company, dated November 19, 1884. In this deed R. G. Luse conveyed unto the grantee named all his right, title, and interest to section 490, "reserving nevertheless to the said R. G. Luse, his heirs and assigns, forever, all the coal and mineral on and in the above-described land, with the right at all times for him or them, or either of them, to enter upon said premises, and to mine and remove the same, or any part thereof, in person and by agents."

By deed dated June 6, 1887, and filed for record February 15, 1889, R. G. Luse conveyed to his brother J. E. Luse, among other properties, the property described as follows: "Also ½ undivided interest in and to the coal and minerals in and of section 490, surveyed by the Southern Pacific Railway Company, in Eastland county, Texas." On January 31, 1918, R. G. Luse and J. E. Luse executed to S. W. Richardson an oil or mineral grant covering section 490, for the sole purpose of mining and operating for oil and gas. February 21, 1918, said Richardson assigned to the defendant Sun Company said lease, which assignment was filed for record in Eastland county February 24, 1918.

Plaintiff Boatman's claim of title is through the Cisco Land, Coal, Manufacturing & Live Stock Company, hereinafter called the Cisco Coal Company. On March 15, 1901, said company conveyed to G. F. Albright by quitclaim deed the land in question, "excepting the coal and mineral which is owned by J. E. Luse and R. G. Luse." This deed was filed for record August 16, 1901. Albright by deed of December 14, 1903, filed January 6, 1904, conveyed to R. L. Jennings the land in controversy, "except the coal and mineral, and the right to prospect for and mine the same, which does not pass hereby." Jennings and wife conveyed to J. B. Ammerman the 80 acres in controversy by deed of September 28, 1906, filed for record May 2, 1907. This deed contained the reservation, "except the coal and mineral rights, which do not pass herein, the same being hereby expressly reserved." By deed dated November 15, 1907, filed for record March 16, 1915, J. B. Ammerman conveyed to plaintiff Boatman the 80 acres in controversy, said deed containing the following stipulation: "There is saved and excepted from the operation of this convey-

ance the mineral right in and to the minerals in and under said land, the same not being conveyed hereby." On May 29, 1918, Boatman and wife executed to J. B. Ammerman and J. J. Butts a certain contract and deed, which was filed for record the same date, which granted, sold, and conveyed unto the said grantees "all the oil, petroleum, and natural gas on and under the surface to 20 acres of said above-described land, the same to be taken and surveyed in a square out of the N. W. corner thereof." On November 16, 1918, J. B. Ammerman executed a second conveyance to plaintiff, covering the land in controversy, "together with all of the oil, gas, and other minerals on and unto the surface thereof." Plaintiff's original petition was filed June 4, 1918; his amended original petition, November 30, 1918; his first supplemental petition, June 14, 1918; his second supplemental petition, September 14, 1918. Defendants' original answer was filed July 16, 1918; their amended answer, October 14, 1918; their first supplemental answer, November 30, 1918. The plea of intervention by J. J. Butts and J. B. Ammerman was filed November 30, 1918, and the defendants' answer thereto was filed on the same day. The answer of the defendant Sun Company was filed November 18, 1918. The case was tried and judgment rendered November 30, 1918.

In his findings of fact the trial court found that prior to the deed from R. G. Luse to J. E. Luse, and prior to the deed from R. G. Luse to the Cisco Coal Company, "that coal had been discovered in the community near which this land in controversy is situated." He further found that prior to that time there had been no oil development for gas purposes in the state of Texas, "in which the mineral rights, in general terms, were reserved." The court further found that prior to the date of the deed from R. G. Luse to the Cisco Coal Company "there had been a well dug about seven miles from the land in controversy, and oil or some volatile substance clung to the rocks, and that said rocks were thrown to the surface, and upon fire being applied to the same burned"; that said well was dug to the depth of 15 feet with a pick and shovel. The court further found that Wm. G. and George A. Audenreid, "who were at one time associated with the defendants R. G. and J. E. Luse, were natives of the state of Pennsylvania, and had had some experience in the coal, oil, and gas fields in that state, and had talked and discussed the matter of oil and gas some time being discovered in the vicinity of the land in controversy."

The evidence further shows that the Cisco Coal Company was composed of the two Audenreids, their sister, Admiral Crosby, and the two Luses; that Wm. Audenreid's headquarters were in Philadelphia, and that he was a retired oil or mineral engineer; that he prospected in Eastland county north of Cisco, and was "around over the ranch property." R. G. Luse testified that prior to the date of the deed from him to the Cisco Coal Company, in 1884, he did not know whether oil or gas had been discovered in paying quantities in the state of Texas, and, if so, he had never heard of it; that he knew at the time of the execution of the deed to the Cisco Coal Company that oil and gas had been discovered in Pennsylvania and other states, and he thought that it was then being produced in such states in commercial quantities; that so far as the witness knew. there had been no oil or gas developed in Texas in paying quantities prior to the date of the execution of the said deed. J. E. Luse testified that he came to Eastland county in 1880, and that he had resided in Cisco most of the time since; that he knew that oil or gas, or indications of them, were discovered in Eastland county prior to 1884, over on Cedar Mountain, in the northern part of Eastland county; that one Mr. Green Smith had a well dug on his place, and "that the rock that came out of it would burn— that is, the oil would burn off of it; that it was discussed with R. G. Luse and with Wm. Audenreid, but the witness did not know whether the matter was discussed over the country;" that when he first came to Eastland county the H. & T. C. Railway Company was beginning operations of some coal mines near Cisco; that he thought such operations began about 1881 and continued for several years. The witness stated that he was a practicing attorney, and drew up the deed from R. G. Luse to the Cisco Coal Company; that he thought then that the word "mineral," as contained in the deed, included oil; that he did not know then that oil was produced by drilling. The Luse brothers both came from Pennsylvania. R. G. Luse left that country when five years of age, but had visited back there a number of times since coming to Texas. He testified that he had heard W. G. Audenreid, who was a mining engineer from Pennsylvania, say that in future years the country around Eastland would develop into an oil field, and that he thought at the time he sold the land to the Cisco Coal Company that oil was being produced in paying quantities in Pennsylvania and other states.

That petroleum and natural fuel gas are classified in science as belonging to the mineral kingdom, and that they are properly included in the term "minerals," is conceded by appellees; but their contention is that at the time of the execution of the deed from R. G. Luse to the Cisco Coal Company, in 1884, oil and gas were not considered as minerals by the masses, and especially by the public generally in Eastland county and

other portions of Texas, and that it is evident that the parties to the transaction did not contemplate that the reservation in said deed should include oil and gas within its terms; that since the facts tend to show that up to this time oil and gas had not been produced in Texas, and especially in Eastland county, in commercial quantities, it is not to be supposed that either the grantor or the grantee intended that the term "mineral," as used in the reservation, should be used and understood in its broad scientific sense, but that its use was in accord with the popular conception at that time in said locality, and that under such popular conception oil and gas were not considered as minerals.

Appellees further rely on the rule of ejusdem generis, i. e., where there is an enumeration of particular things, followed by general words, the latter shall be construed as having reference to things only of the same kind and class with those specifically mentioned; and, as the parties to the deed specifically mentioned only "coal," that by the use of the expression "and mineral," following the specific species or kind, the parties intended to include under the larger or class term only minerals of the general character peculiar to coal; that, if the term "mineral" should be interpreted in its broad scientific sense, it would include all the elements, even water, constituting the soil or land conveyed, and that such construction is not permissible, for by it the grant would be rendered invalid for repugnancy. Appellees rely on a line of decisions, principally from Pennsylvania, which severally hold that, under the circumstances therein shown, it is evident that the parties to the lease or deed did not intend that oil or gas should be included in the specification "mineral," "minerals," "all minerals," etc. In the early case of Dunham v. Kirkpatrick, decided in 1882, and reported in 101 Pa. 36, 47 Am. Rep. 696, the Supreme Court of Pennsylvania had under consideration the following reservation clause: "Excepting and reserving all the timber suitable for sawing; also all minerals; also the right of way to take off such timber and minerals." The cause was submitted to the court under an agreed statement of facts, which statement failed to show what the intention and understanding of the parties to the deed were, except as revealed by the instrument itself. The court, in the course of its opinion, said:

"The reservation in the agreement of December 5, 1870, between Wood & Co. and Kirkpatrick, is of 'all timber suitable for sawing, also all minerals.' The defendants, who claim under a lease from the vendors in the agreement above stated, contend that it is their right, under the reservation, to enter upon, and take from, the premises in said agreement described, all the petroleum, or mineral oil, that may be found therein. This contention can be sustained only under the hypothesis that the word 'minerals' in the reservation includes petroleum. * * * It is true that petroleum is a mineral; no discussion is needed to prove this fact. But salt and other waters, impregnated or combined with mineral substances, are minerals; so are rocks, clays, and sand; anything dug from mines or quarries; in fine, all inorganic substances are classed under the general name of minerals. Bou. L. Dic.; Wor. Dic.; Dana's Geology; Grey's Botany. But if the reservation embraces all these things, it is as extensive as the grant, and therefore void. If, then, anything at all is to be retained for the vendor, we must, by some means, limit the meaning of the word 'minerals.' But the rule by which this may be done is well stated by Chief Justice Gibson in the case of the Schuylkill Navigation Co. v. Moore, 2 Wh. [Pa.] 477, as follows: 'The best construction is that which is made by viewing the subject of the contract as the mass of mankind would view it; for,' continues the learned Chief Justice, 'it may be safely assumed that such was the aspect in which the parties themselves viewed it.' * * * Certainly, in popular estimation petroleum is not regarded as a mineral substance any more than is animal or vegetable oil, and it can, indeed, only be so classified in the most general or scientific sense. How, then, did the parties to the contract under consideration think and write? As scientists; or as business men, using the language and governed by the ideas of everyday life?

"As we have before observed, if this reservation is to have a strictly scientific construction it is as extensive as the grant; hence works its own destruction. On the other hand, if we adopt the popular understanding, we cannot regard petroleum as a mineral. Moreover, we may be very sure that, when Wood & Co. made their contract with Kirkpatrick, they did not intend to reserve the mineral oil that might afterward be found in the land, otherwise that intention would have been expressed in no doubtful terms. They were, doubtless, at that time unaware of the character of the property as oil territory. But if they did entertain such an idea, and expected to reserve oil under the general term 'mineral,' they were mistaken, and should have known that they were using that word in a manner not sanctioned by the common understanding of mankind; hence in a manner that could not be approved by the courts of justice."

This parent case has been rather consistently followed by the Supreme Court of Pennsylvania, but the construction has been adhered to apparently in later decisions from that court because, as stated, such construction "has become a rule of property in the state," and therefore must be adhered to. In many decisions by the Pennsylvania court it has been recognized that such rule of construction is opposed to the general trend of authority in other states; and in other cases it would appear that the Pennsylvania court failed to follow the rule laid down in Dunham v. Kirkpatrick, to wit, that the use of the term "mineral" should be construed in its popular rather than in its

scientific sense. For instance, in Gill v. Weston, 110 Pa. 312, 1 Atl. 921, the court says:

"It matters not that the act of 1855 was passed before petroleum was discovered. It is a mineral substance obtained from the earth by a process of mining, and lands from which it is obtained may, with propriety, be called mining lands."

In the case of Silver v. Bush, 213 Pa. 195, 62 Atl. 832, where the conveyance was of "pieces or parcels of land, together with all and singular the improvements, ways, waters, water courses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereunto belonging, or in any wise appertaining, and the reversions and remainders," etc., there was a reservation in the habendum clause, "except the mineral underlying the same, and a right of way to and from said mineral, which the first parties reserve," and it was held that such reservation did not include natural gas. In the opinion the court said:

"Certainly such gas is a mineral in the broadest sense of the term, but no evidence was given or offered to show that the parties so understood or intended the word 'mineral,' or even that it had acquired a usage in conveyancing which would include gas" (citing Dunham v. Kirkpatrick).

In the Pennsylvania case of Hendler v. Lehigh V. Ry. Co., 209 Pa. 256, 58 Atl. 486, 103 Am. St. Rep. 1005, it was said that while the word "mineral" has a very broad meaning, and also a more scientific use, it has likewise a commercial sense, in which it is most commonly used in conveyances and leases of land, and in which it may be presumed to be used in such instruments. In that sense it may include "any inorganic substance found in nature, having sufficient value separated from its situs as part of the earth to be mined, quarried, or dug for its own sake or its own specific uses." In this case it was further said:

" 'Coal and other minerals,' the expression used, indicate substances which, like coal, have a value of their own, apart from the rest of the land, sufficient to induce the expense and labor of severance for their own sakes. These the grantor intended, and expressed the intention, to except from his grant and reserve to himself. While coal was the principal, and perhaps the only, thing clearly in view, yet the reservation was not meant to be limited to that, for then the addition 'and other minerals' would be superfluous and misleading. A vein of fine marble would clearly be reserved, and so, probably, if near enough a market to have a value, would be granite, or limestone or other building material, potter's or porcelain clay, and the like. Sand might or might not be in this category. A vein of pure white quartz sand, valuable for making glass or other special use, would be within the reservation; while common mixed sand, merely worth digging and removing as material for grading, would not be."

If we should apply the rule of ejusdem generis, what qualities or peculiarities of the specified type, "coal," shall be considered in determining the classification intended by the use of the word "mineral"? Are we to classify according to value? If so, can it be said that oil or gas on the one hand and coal on the other are of different kinds or species of minerals? If we classify as to use, is it not true that all three are used for fuel? Shall the classification be determined by the form, density, color, weight, value, or uses of the particular species mentioned? Taking either value, use, or nature of origin as the basis of the classification mentioned, can we say that oil and coal do not belong to the same class? It is true that coal in its commercial form is found in a solid state, while oil is a liquid. But are we justified in limiting the minerals intended to be included in the reservation to those only which are found in a solid state? Such evident difficulty in applying the rule of ejusdem generis to the terms of the reservation under consideration renders it an unsafe guide, and we do not believe any aid in the interpretation of the terms used in the reservation will be afforded by such rule. Nephi Plaster & Mfg. Co. v. Juab County, 33 Utah, 114, 93 Pac. 53, 14 L. R. A. (N. S.) 1043.

In the well-considered case of Murray v. Allred, 100 Tenn. 100, 43 S. W. 355, 39 L. R. A. 249, 66 Am. St. Rep. 740, the Supreme Court of Tennessee held that petroleum and natural gas are mineral within the terms of a reservation of "mines, minerals, and metals," contained in a deed dated 1853. After giving a scientific definition and description of petroleum, and quoting from learned geologists, the court says:

"Clearly, from this description of the substance, it could not in any sense fall under the terms 'metal' or 'metallic.' The question, then, to be determined, is, does it fall within the term 'mine and minerals'? In 2 Rap. & L. Law Dict. p. 821, it is said: 'In the most general sense of the term, "minerals" are those parts of the earth which are capable of being got from underneath the surface for the purpose of profit. The term, therefore, includes coal, metal ores of all kinds, clay, stone, slate, and caprolites. "Surface" means that part 'of the land which is capable of being used for agricultural purposes. * * * "Mineral" originally signified that which is obtained from a mine; from underground mining, as distinguished from that which is quarried. The term is not limited to metallic substances, but includes salt, coal, paint, stone, and similar substances;' citing, on the last point, Hartwell v. Camman, 10 N. J. Eq. 128," 64 Am. Dec. 448.

In Texas Co. v. Daugherty, 107 Tex. 226, 234, 176 S. W. 717, 719 L. R. A. 1917F. 989, our own Supreme Court in a well-considered

opinion by present Chief Justice Phillips, says:

"It is no longer doubted that oil and gas within the ground are minerals. They have peculiar attributes not common to other minerals because of their fugitive nature or vagrant habit, and the disposition to wander or percolate, and the possibility of their escape from beneath one part of the surface of the earth to another. Nevertheless they are to be classed as minerals;" citing authorities.

The case of Barker v. Campbell, 167 Pac. 468, L. R. A. 1918A, 487, decided in 1917 by the Supreme Court of Oklahoma, involved the construction of a reservation in the following words:

" 'However, it is hereby agreed that the parties of the first part reserve all mineral rights upon the above-described lands, and the right to enter thereon, and to use so much of the surface as may be reasonable for the purpose of extracting the mineral thereon at any time, is reserved from this grant.' "

The Court said:

"The first question to be determined is whether oil and gas, are included in the language of the reservation of 'all mineral rights.' The lower court held they were included in the reservation, and we so hold. The authorities, so far as our examination goes, generally hold oil and gas to be minerals. The only case to the contrary is Dunham v. Kirkpatrick, 101 Pa. 36, 47 Am. Rep. 696, and relied upon by plaintiff. The great weight of authority is not only opposed to this case, but in the later cases that court treats oil and gas as mineral substances. Gill v. Weston, 110 Pa. 312, 1 Atl. 921."

Then the court cites authorities supporting the view announced.

In Nephi Plaster & Mfg. Co. v. Juab, 33 Utah, 114, 93 Pac. 53, 14 L. R. A. (N. S.) 1043, already referred to, the Supreme Court of Utah says:

"From an examination of a large number of cases we are convinced that the foregoing is a fair deduction of the law upon the subject as declared by the modern decisions both of England and this country. From the foregoing, it thus seems clear to us that where we find the terms 'mines and minerals' used in grants or in reservations, in instruments of conveyance, in statutes or Constitutions, under the modern construction, the former is not limited to mere subterranean excavations or workings, nor is the latter limited to the metals or metaliferous deposits, whether contained in veins that have well-defined walls or in beds or deposits that are irregular, and are found at or near the surface or otherwise."

The Supreme Court of Alabama in the case of McCombs v. Stephenson, 154 Ala., 109, 44 South. 867, criticized the case of Dunham v. Kirkpatrick, and in construing a reservation covering "all the coal, ores, and other minerals and metals in, under, and upon" the land described, used the following language:

"In view of the meaning of the word, and of the various decisions bearing on its practical use, the American and English Encyclopedia of Law gives what seems to be a workable definition as follows: 'By the term "minerals" are meant all the substances in the earth's crust which are sought for and removed by man for the substance itself. It is not limited to metallic substances, but includes salt, coal, clay, stone of various sorts, etc., and even petroleum and natural gas have been held to be minerals.' * * * There is no evidence of any usage to show that the word 'minerals' was used in any other sense than as it is defined in the books."

See, also, Deer Lake v. Michigan Land Co., 89 Mich. 180, 50 N. W. 807; Sult v. Hochstetter Oil Co., 63 W. Va. 317, 61 S. E. 307; Ky. Diamond Mining, etc., v. Transvaal Diamond Co., 141 Ky. 97, 132 S. W. 397, Ann. Cas. 1912C, 417. In the last-cited case, where the reservation was as to "all the mineral," the court says:

"Would it be doubted that, if gold had been discovered, it would have passed by this deed, although Ratcliff at the time thought he would find silver. Or, if he had failed to find silver and had found lead, would it be doubted that this would pass by the deed? It may be true that, when the deed was made, the parties did not know what minerals were under the land; but the fact that they did not have diamonds in mind in no manner affects the conveyance when by it they conveyed all the mineral."

See, also, People v. Bell, 237 Ill. 332, 86 N. E. 593, 19 L. R. A. (N. S.) 746, 15 Ann. Cas. 511; Armstrong v. Lake Champlain Oil Co., 147 N. Y. 495, 42 N. E. 186, 49 Am. St. Rep. 683; Southern Oil Co. v. Colquitt, 28 Tex. Civ. App. 292, 69 S. W. 169; Swayne v. Lone Acre Oil Co., 98 Tex. 607, 86 S. W. 740, 69 L. R. A. 986, 8 Ann. Cas. 1117.

But the appellees contend that by the use of the expression that grantor or his assigns might go upon the premises in controversy "for to mine and remove the same," it is evident that the parties to the deed intended to reserve only such minerals as were "mined," and that that term is limited to operations involving excavations, sinking of shafts, etc., similar to the operations required for extracting coal or other solid minerals. "A mine is an excavation in the earth for the purpose of obtaining minerals." Bouvier's Law Dictionary. The verb "mine" is defined in the Standard Dictionary as meaning: "To obtain by digging out of the earth; also, to make diggings into for ore or the like; as, coal is mined; they mined rich veins of silver." The word "mine" is derived from the Latin word "minare," signifying "ducere," to lead or draw, with reference to subterranean passages. Bryan, Law of Petroleum and Gas, § 1; Bainbridge, Mines and Minerals, pp. 1–3. "Mining" is a generic term which

includes the whole mode of obtaining metals and minerals from beneath the surface of the ground. Williams v. Toledo Coal Co., 25 Or. 426, 36 Pac. 159, 42 Am. St. Rep. 799. Hence we think the term "mine" is broad enough to include the process of boring into the ground for the purpose of reaching and extracting oil or gas; that it makes no difference whether the means used for extracting the mineral sought is that of pick and shovel or other implement used for excavating, or by drill or bit.

Appellees lay special stress on the contention that in 1884, when this deed was executed, that probably the only American decision upon the point in question was the case of Dunham v. Kirkpatrick, and in that case it had been decided that the proper construction of a reservation like this would not permit the inclusion of oil and gas as minerals; that as all of the parties, the two Luse brothers, and the two Audenreids, were from Pennsylvania, and that as one of the Audenreids was a mining engineer, it may reasonably be inferred that they had in mind the announcement of the Pennsylvania court, and that the reservation in the deed was not intended to include oil and gas. Perhaps some force should be given to this contention. But it will be noted that in the deed from R. G. Luse to J. E. Luse, some three years subsequent to the deed to the Cisco Coal Company, it is recognized that in said former deed the title was reserved to the grantor in and to the "coal and minerals," indicating that the reservation included minerals other than coal; also in the deed from Albright to Jennings, some twenty years later, the same reservation is made; and in the deed from Jennings to Ammerman, Boatman's immediate grantor, which was dated September 28, 1906, "the coal and mineral rights" were specially excepted from the conveyance; and in the deed from Ammerman to Boatman, dated November 15, 1907, 23 years subsequent to the Cisco Coal Company's deed, there is saved and excepted from the operation of the conveyance "the mineral right in and to the minerals in and under said land." At the time of the deeds from Jennings to Ammerman and from Ammerman to Boatman many decisions had been rendered by courts of last resort in various states upon the question as to whether oil and gas were included in the term "mineral" or "minerals," and the large majority of the adjudicated cases at that time upon this point had held that oil and gas were miner-

als. Murray v. Allred, supra, was decided in 1897. In 1894 the Supreme Court of Appeals of West Virginia had said in Williamson v. Jones, 39 W. Va. 231, 19 S. E. 436, 441, 25 L. R. A. 222: "Whatever the earlier decisions in other states may have been, it has never been so held in this state; and the authorities now very generally—universally, as far as I have examined them—hold petroleum to be a mineral." In 1866, in Funk v. Haldeman, 53 Pa. 249, the Supreme Court of Pennsylvania said, "Oil is a mineral, and, being a mineral, is part of the realty." But it may be further insisted by appellees that since, subsequent to the filing of this suit, Ammerman executed and delivered to Boatman a deed dated November 16, 1918, conveying the land in controversy, together with all of the oil, gas, and other minerals on and under the surface thereof (this conveyance being in addition to the deed executed by Ammerman to Boatman in 1907), that plaintiff Boatman's title to the oil and gas under his land was not affected by the mineral reservation included in the conveyance of 1907; that is, if the reservation in the deed from Ammerman to Boatman of November 15, 1907, could be held to be more comprehensive than the reservation in the deed from R. G. Luse to the Cisco Coal Company, and more comprehensive than the reservation in the intervening deeds making up the chain of title under which Ammerman held, that Boatman, by virtue of the second deed from Ammerman, dated November 16, 1918, acquired all mineral rights which were not expressly, or by necessary implication, reserved in deeds prior to the deed from Jennings to Ammerman, dated September 28, 1906. But, even if this contention be given force, we think it should not prevail. In view of the great preponderance of judicial expression from the various state courts of last resort, announced prior to the time when Ammerman acquired title to the land, to the effect that oil and gas should be construed as within the term "mineral" or "minerals" in a reservation, we are of the opinion that Ammerman himself acquired no title to the oil and gas under his land, and therefore could not convey such title. Nor do we think title to the minerals under the land could be sustained under plaintiff's plea of limitation.

By reason of the conclusion thus reached, it follows that the judgment of the trial court should be reversed, and judgment here rendered for appellants; and it is so ordered.